# HUNTER *v.* STIKEMAN.

PATENTS; INTERFERENCE; BURDEN OF PROOF; REDUCTION TO PRACTICE; MODELS; ABANDONMENT.

1. In an interference case, the burden of proof is upon the junior applicant, not only to show priority of invention, but that he has, as against the senior applicant, used reasonable diligence in reducing his invention to actual practice.

2. A small experimental model, intended only as an illustration, and of a size not to be of any practical value for the use to which the invention was to be applied, and which was put away by its maker after it was made and not attempted to be used until after a declaration of interference, does not constitute a reduction to practice.

3. To entitle a later applicant to a patent, where he has connected by due diligence a prior conception, the reduction to practice must be by the applicant himself or by his authorized agent.

4. Where a party has invented two similar devices for the same article of manufacture, he does not necessarily abandon one by applying for a patent for the other, if there is a sufficient difference in principle governing the two devices to justify the issuance of patents for both.

Patent Appeals. No. 92. Submitted May 10, 1898. Decided October 3, 1898.

HEARING on an appeal from a decision of the Acting Commissioner of Patents in an interference proceeding. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Fred. G. Emery* for the appellant.

*Mr. Thomas A. Connolly* for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This is an appeal from the Patent Office in an interference proceeding. The declaration of interference as originally made was as between William H. Winslow and Francis A. Winslow, of the one part, and George Stikeman, of the other part, the respective claims of the parties having relation to library-shelving. Subsequently, David E. Hunter, the present appellant, interposed a claim to the same invention, and he became a party to the interference proceeding for the purpose of having the question of priority of invention determined.

The application of George Stikeman was filed October 14, 1895; that of the Winslows on November 11, 1895; and the application of Hunter was filed February 14, 1896. The declaration of interference, as between the Winslows and Stikeman, was entered December 17, 1895, and which forms the issue of the case as now presented between Hunter, the appellant, and Stikeman, the Winslows having taken no testimony in support of their claim.

The issue of interference, as framed on the respective claims, is as follows:

"A bracket for library-shelving, composed of a vertical plate with a vertical flange at its rear edge, and a threaded bar extending from the front edge of the bracket through said vertical flange, and having a head adapted to embrace a vertical column."

In the preliminary statement of Stikeman he states that he conceived the invention in issue on or about the 15th of April, 1893, and about the same time he made sketches of the same, and that he made other drawings and sketches of such invention between the 7th of December, 1893, and the 1st of January, 1894; that he disclosed the invention to others on or about the 1st of January, 1894; that he started work on a pattern of the invention on or about the 1st of

January, 1894, and completed such pattern about the 1st of February, 1894; than on or about the 7th and 9th of February, 1894, he had castings made from the pattern referred to, and had these and the other parts of the invention finished and applied on or about March 1, 1894; that he made no model of the invention, but that on or about the 1st of March, 1894, he reduced his invention to practice and embodied the same in a full-sized structure, which, as soon as completed, was successfully operated and used, and that he has since that date continued to manufacture the invention for use and sale.

The Winslows, in their preliminary statement, say that they conceived the invention in issue on or about the 14th of March, 1895 ; that they explained the invention to others on or about the 15th of March, 1895; that they had drawings made of it on or about the 18th of March, 1895; and a model made of it on or about the 4th of April, 1895 ; and that they embodied the invention in a full-sized bracket about the 20th of June, 1895, and that they successfully operated the said bracket.

Hunter, in his statement, says that he conceived the invention involved in the interference on or about the 1st of May, 1892, and at once made working drawings illustrative of said invention; that he disclosed his said drawings and invention to others in the month of May, 1892, and, as nearly as he can ascertain, about the middle of the month; and that, on or about the 1st of June, 1892, he made and successfully operated a full-sized device embodying said invention; that he never made a small model, but subsequent to June 1, 1892, he made other full-size and complete devices embodying said invention, many of which are now in regular use by the public.

A considerable volume of testimony was taken on the part of Hunter and Stikeman, respectively, but none was taken on the part of the Winslows. Stikeman being the first to make application, he is of course entitled to the

benefit resulting from seniority of application—that is to say, of constructive reduction to practice—and consequently the casting of the burden of proof upon Hunter to show not only priority of invention, but that he has, as against the prior applicant, used reasonable diligence in reducing his invention to *actual practice*, that is to say, in developing and perfecting the same. For, in such case, without reduction to actual practice within a reasonable time, the mere conception of an invention amounts to nothing.

The case was differently decided by the several tribunals of the Patent Office. The examiner of interferences awarded priority to Stikeman; but on appeal that ruling was reversed by the examiners-in-chief (two of the board sitting), and priority was awarded to Hunter. And on appeal to the Commissioner by Stikeman, the latter ruling was reversed, the acting Commissioner concurring with the examiner of interferences. Whereupon Hunter has appealed to this court.

It may be conceded that Hunter was the first to conceive the invention involved in the issue; and upon that concession, the question is, whether it be sufficiently and clearly shown that Hunter reduced his conception to practice, so as to overcome and rebut the claim of Stikeman?

Priority of invention was awarded to Stikeman by the examiner of interferences and by the acting Commissioner, on the ground that he (Stikeman) was the first to reduce the invention to practice, and that Hunter, though prior to conceive, had not used due diligence in reducing the conception to actual practice. Hunter relies upon his exhibit, designated as "Hunter's Exhibit First Device," for the purpose of showing that he reduced the invention to practice as early as 1892. This he alleges in his preliminary statement, and he attempts to establish the fact by proof, but all three of the tribunals in the Patent Office concur in holding that the exhibit, "First Device," was not sufficient to establish the fact that the conception of Hunter was reduced to

practice in 1892. The examiners-in-chief held, however, that his conception was reduced to practice at a subsequent date, and that therefore it was not necessary to decide the question of negligence. The model or "First Device" exhibited by Hunter as evidence of the reduction to practice by him of the invention in 1892, is clearly not of a character to establish the fact of reduction to practice; and the officials in the Patent Office were manifestly right in so deciding. It was, at most, but a small experimental model, and of a size not to be of any practical value for library shelving. It was never intended to exhibit the invention in a practical form or size, but only by way of illustration; and after it was made, in 1892, it was put away and no use whatever was attempted to be made of it until after Stikeman and the Winslows had made their applications and an issue of interference had been declared between them. Then it was for the first time brought forward, in 1896, as evidence of the reduction to practice of the invention in 1892.

It is settled by a uniform course of decision, in the Patent Office and elsewhere, that, "in the invention of a machine, actual reduction to practice consists in the making of a machine of a size adapted for actual work, and proof of some kind, preferably by means of actual trial, that the machine will work practically and successfully." *Schmiede* v. *Both*, C. D., Vol. 50, p. 401. And so again it is said, "reduction to practice is reduction to a form adapted to practical use." *Manning* v. *Easley*, 51 O. G. 1617; *Allis* v. *Buckstaff*, 22 O. G. 1705; 13 F. R. 879.

In the case of *Hanvey* v. *Willard*, C. D., 1871, p. 297, it was said:

"Hanvey invented a barrel in 1866, and produced small specimens for exhibition, but there was no evidence to show that he ever produced a full-sized barrel for use prior to the date of filing his application. The law does not always reward the man who actually conceives of and makes a model

and drawing of a machine or article of manufacture. Of two independent inventors that man is first in the eyes of the law who first reduces the invention to practice by embodying it in a working machine or a marketable article of manufacture."

And so it has been held " that an experimental use of a machine conducted in the exclusive presence of parties who thought of purchasing it, though continued for three days, and though it worked satisfactorily, is not a reduction of the invention to practice, if no further use was made of the machine, and it was afterwards broken up and lost." *Stoddard* v. *Perry*, 6 O. G. 33.

So strict is the rule upon this subject that it has been held that complete invention must amount to demonstration. It must be shown to have passed the region of experiment— of possible or probable failure—and that it has arrived at certainty by being embodied in the form intended, capable of producing the desired results. A model alone, no matter how complete in detail of construction, does not come within the operation of such a rule. *Stephenson* v. *Goodell,* 9 O. G. 1195.

In questions of priority of invention, in matters of interference, the party first making application for patent has a *prima facie* case as against a junior applicant. The onus of proof is upon the latter, and unless that onus is fully discharged the senior applicant must prevail. This principle is well and fully illustrated in the case of *Coffin* v. *Ogden,* 18 Wall. 120, where the question arose in a case of infringement. In that case it was said by the court:

" The invention or discovery relied upon as a defense must have been complete, and capable of producing the result sought to be accomplished; and this must be shown by the defendant. The burden of proof rests upon him, and every reasonable doubt should be resolved against him. If the thing were embryonic or inchoate; if it rested in speculation or experiment; if the process pursued for its

development had failed to reach the point of consummation, it can not avail to defeat a patent founded upon a discovery or invention which was completed, while in the other case there was only progress, however near that progress may have approximated to the end in view. The law requires not conjecture, but certainty. If the question relate to a machine, the conception must have been clothed in substantial forms which demonstrate at once its practical efficacy and utility. _Reid_ v. _Cutter_, 1 Story, 590. The prior knowledge and use by a single person is sufficient. The number is immaterial. _Bedford_ v. _Hunt_, 1 Mason, 302. Until his work _is done_, the inventor has given nothing to the public."

It is not pretended that Hunter ever put his " First Device," made in 1892, to any practical use as a completed article of invention; nor was it designed with that view or intent. It was simply an illustrative model, and Hunter does not appear to have done anything with this model or device himself until it was produced as evidence in the matter of this interference. It has been put away, and there was no attempt to make practical use of it.

It is contended, however, for Hunter, that, though his " First Device," filed as an exhibit, may not be sufficient to establish the fact of reduction to practice of the invention in 1892, yet the drawings and devices produced by the Winslows show his invention to have been reduced to practice between March and June, 1895, according to the preliminary statement filed by the Winslows and the testimony of the witness Davidson.

But, conceding for the sake of the argument advanced for Hunter, that the drawings and devices produced by the Winslows may be appropriated and availed of by Hunter to establish reduction to practice, the question arises whether Stikeman did not _actually reduce_ his invention to practice and produce a completed article of the invention described in the issue, before the supposed reduction to

practice by the Winslows, the benefit of which is now sought to be availed of by Hunter?

It is shown in the evidence taken on the part of Stikeman that Stikeman's conception of the invention in issue was made about the 15th of April, 1893, and that immediately thereafter and during the Summer and latter part of the Fall of 1893 he made three separate descriptive and illustrative drawings of the invention, which are produced in evidence and marked "Exhibits First, Second, and Third Drawings." After these drawings, he immediately, according to his testimony, commenced to work out his ideas in a practical way by producing a standard with a bracket, and put the several parts together in order to produce a complete stack, which he produced in evidence, designated as "Stikeman Stack." And after a full description of the construction of the "stack," and all the circumstances, and by whom and where the mechanical work was done, he says that the stack exhibited was completed between February 15 and March 1, 1894.

He was then asked by his counsel how long the stack remained at the works of A. B. & W. T. Westervelt after its completion. His answer was, "Not over forty-eight hours." His examination then proceeds:

"Int. 43. Did any one else besides W. T. Westervelt and A. S. Westervelt see the stack while it was at the works of the Westervelts?

"Ans. I think that another workman, named B. J. Jones, saw the exhibit after it was put together, he being about the shop at that time.

"Int. 44. While the exhibit was at the works of the Westervelts, were the brackets manipulated or adjusted?

"Ans. They were.

"Int. 45. State whether or not at that time any trial or test was made of the structure, and whether or not the shelf and brackets were put to any service?

"Ans. Yes; there were several books placed on the shelves at the time.

"Int. 46. For what purpose were these books put on the shelves?

"Ans. To see if the structure was practical in every way, and that when pressure was brought to bear on the front of the shelf it had an inclination to cant or tip up.

"Int. 47. What was the result of these tests?

"Ans. I concluded that it was practical in every way, and would answer for all requirements for book-shelving.

"Int. 48. How nearly do the brackets, the standards, shelves, and devices for securing the brackets to the standards conform in size, shape, and strength to the commercial requirements of book-shelving for actual practical use?

"Ans. There is really no difference in the size of the stacks that we have since erected in various libraries throughout the country, both as to standards, to brackets, and width and thickness of the shelves of the exhibit, and to prove my assertion I produce a bracket that is now sold for commercial use by the Westervelts.

"Int. 49. Is the Exhibit 'Stikeman Stack,' a structure capable of being applied to practical and useful purposes as a book-support?

"Ans. It is in every way.

"Int. 50. What would be required, if anything, to adapt the different elements or features of the exhibit stack to actual use in libraries of any considerable magnitude?

"Ans. It would simply be necessary to increase the height of standards, make the shelves any desired length to conform to the floor space, and to duplicate the brackets with their set-screws and draft-pins.

"Int. 51. The issue of the interference recites the subject-matter involved in the controversy, as a bracket for library-shelving, composed of a vertical plate with a vertical flange at its rear edge, and a threaded bar extending from the front edge of the bracket through said vertical flange, and

having a head adapted to embrace a vertical column. Which of the brackets of the exhibit stack is provided with a vertical plate with a vertical flange at its rear edge?

" Ans. All the brackets.

" Int. 52. Which of the brackets of the exhibit stack are provided with a threaded bar extending from the front edge of the bracket through the vertical flange at the rear edge, and having a head adapted to embrace a vertical column?

"Ans. The two steel brackets.

" Int. 53. What form of threaded bar are the cast brackets provided with?

"Ans. Same bar, having the end threaded passing through the threaded nut or lug and bearing against the outer surface of the channel-standard.

" Int. 54. State whether or not the structure of the cast brackets is such as to permit in connection therewith the use of a threaded bar having a head adapted to embrace a vertical column?

"Ans. It is and can be used with the head as readily as the threaded bar."

It is unnecessary to state more of the testimony of Stikeman, though he has gone very fully into the details of the structure of his exhibit " Stikeman Stack," and to show its conformity to the requirements of the issue. The testimony of Stikeman, in respect to dates and the construction of the exhibit " First Stack," and the character of that structure, is fully corroborated by the testimony of the two Westervelts, particularly that of W. T. Westervelt. This last-named witness says he saw the stack in the Winter of 1893–4 or in the early Spring of 1894. It was at 102 Chambers Street, New York, where it was shown him by Stikeman. He says:

" It was operated and fully explained and worked, showing how it was absolutely adjustable, and his recollection is that books were placed on the shelf, but as to the last he would not swear positively. It was kept in the office but for

a short time, and then Mr. Stikeman took it to Washington to the office of his attorneys, Connolly Bros."

In answer to the question, as to how do the brackets, the supporting-columns, and the shelves in the Stikeman stack compare in point of size and proportion with the same parts in library or shelf supporting structures which have since been made and erected for actual uses, the witness says: "They are practically the same. They may vary a half-inch. They are actually the same."

According to this proof, it would seem to be clear, that the Stikeman stack has all the essential parts and elements and completeness to entitle it to be considered a full reduction to practice of the invention involved in the issue of interference; and we therefore entirely concur with the examiner of interferences, that such exhibit is satisfactory evidence of the reduction to practice of the invention by Stikeman.

But it is contended on the part of Hunter, that notwithstanding he personally has done nothing by way of adapting and perfecting his invention, apart from the model made in 1892, yet the reduction to practice by Stikeman is overcome and displaced by the device of Winslow Brothers, of Chicago, made, as it is stated, in the early part of the year 1895, containing substantially, as it is alleged, the same elements of the "Hunter Exhibit Sample Commercial Device," and which, as it is contended, was made in pursuance of an effort to perfect the invention of Hunter by the Winslows.

The effort is thus made to connect the alleged full-sized bracket made by the Winslows on or about June, 1895, with the original conception of Hunter in May, 1892, and thus to overthrow the otherwise perfected invention of Stikeman.

The Winslows are parties to this interference, though they have taken no testimony in support of their claims; and it is by virtue of their acts that Hunter now claims and seeks

to eke out reduction to practice of his original conception.
The Winslows, however, as we have seen, claim to have con-
ceived the invention in issue themselves on or about the 14th
of March, 1895, and to have explained it to others about
the same time; that they made drawings about the 18th of
March, and a model thereof on or about the 4th of April,
1895, and that they embodied the invention in issue in
a full-sized bracket on or about the 20th of June, 1895.
This bracket, however, has not been produced in evidence,
nor has either of the Winslows been produced as a witness
to testify to the circumstances under which they make claim,
or as to the reasons why they have not been active in prose-
cuting their claim to the invention. As Hunter claims
the perfection of his invention through these parties, it
would seem but reasonable that he should have produced
their testimony. It is a manifest inconsistency that they
should, under oath, set up claim to the invention them-
selves, if they were, in fact, acting for and in behalf of Hun-
ter in merely perfecting his invention and placing him in
position to assert his rights. But the evidence relied on to
support this pretension on the part of Hunter, as means of
establishing the fact of reduction to practice, and of rebutting
and overthrowing the *prima facie* case made by Stikeman, is
radically defective. Davidson, the representative of the Li-
brary Bureau, and a witness produced in support of the claim
of Hunter, visited Chicago, according to his statement, some
time in the latter part of January, 1895, when he saw and
communicated with the Winslows upon the subject of the
manufacture of library shelving; and he says that within
the week that he was in Chicago, the Winslows produced and
showed him an upright and bracket embodying the feature
of the drawing-screw, and assured him (the witness) that the
uprights could be made accurately and at a good deal less
expense than the forms which the witness's company had
been using. "This is the form that we have since used with
slight modifications, or, at least, no material addition, in

13 Ct. App.—16

our stack contracts, which have been quite large since that time."

In all the communication Davidson had with the Winslows, it is not shown that there was any representation of or on behalf of Hunter, or that Hunter's invention was in any manner made the subject of discussion or negotiation. Indeed, it is not shown that the Winslows were even made aware of the fact that Hunter had then conceived the invention or that he had made his first device—a mere illustrative model. The bracket and upright referred to by Davidson, not being produced in evidence, it is impossible to say whether it in any particular embodies the invention in issue.

As is well said in the brief of counsel for Stikeman, "there is no proof whatever that the bracket and upright produced at that time by the Winslows was a *reduction to practice* of anything, still less that it was a reduction to practice of the invention in issue, and there is absolutely no ground upon which it can be predicated that the work, whatever it was, was for or on behalf of Hunter."

Hunter himself testifies that he did not authorize any communication with the Winslows upon the subject of his invention and did not know that any had been made in regard thereto by Davidson.

Now, it is a well-settled principle in the patent law, that while that law accords the right to a patent to the later applicant who connects by due diligence a prior conception, the reduction to practice must be by the applicant himself, or by his authorized agent, and not by some other third party. It is not enough to entitle an applicant to a patent that some one else has shown the practicability of the invention by reducing it to practice. The work of such third party will not be taken as sufficient to relieve the applicant of the consequence of his own want of diligence. The subject is very fully and clearly discussed in the case of *Burgess* v. *Wetmore,* 16 O. G. 765.

There is clearly nothing in the case to justify the conclusion that the work done by the Winslows, whatever it may have been, can be availed of by Hunter for the purpose of showing a reduction to practice of his conception, and thus to defeat the perfected invention of Stikeman.

Finally, it is contended on the part of Hunter that Stikeman, by applying for and obtaining a patent, dated June 18, 1895, for a set-screw bracket for library shelving, abandoned the device of a draft-screw bracket—that involved in the present issue. But manifestly there is no ground for this contention. It is very correctly replied, on the part of Stikeman, that he was not required to patent the draft-screw bracket, or to put the draft-screw brackets on the market, in order to avoid the presumption of abandonment. In his testimony Stikeman has fully and satisfactorily explained why he patented the set-screw bracket at the time and reserved, without abandoning or intending to abandon, the draft-screw bracket.

Finding no error in the ruling appealed from, the decision of the acting Commissioner will be affirmed, and the proceeding and decision of this court are directed to be certified to the Commissioner of Patents, to be entered of record in the Patent Office; and it is so ordered.

*Rulings affirmed.*