### HARRISON et al. v. CADWELL.
Patent Appeal No. 2270.

Court of Customs and Patent Appeals.
April 14, 1930.

William F. Hall, of Washington, D. C. (Spear, Middleton, Donaldson & Hall, of Washington, D. C., of counsel), for appellants.

George F. Gourley and Walter L. Pipes, both of New York City (Ernest Hopkinson, of New York City, of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

This interference proceeding, which is an appeal from the decision of the Board of Appeals of the United States Patent Office, involves the question of priority of an invention of a process for vulcanizing rubber.

The value of the invention is emphasized by the size of the record (more than 2500 pages) and the briefs (more than 300 pages). There are more than 100 exhibits in the case, and a great number of legal questions are raised and argued at length, most of which questions require no consideration by us.

The interference is between two patents numbered 1,434,892 and 1,434,908, of Harrison and Morton, appellants, granted November 7, 1922, and a single application by Cadwell, appellee, filed February 1, 1921. Harrison's and Morton's applications were filed March 5, 1921. Appellants' assignee is the Miller Rubber Company. Cadwell was a chemist in the employ of the United Rubber Company or its subsidiary, the Naugatuck Chemical Company. For the purpose of interference, eleven counts were taken from

the patents of Harrison and Morton, No. 1 and No. 7 of which were regarded by the Board of Appeals as illustrative, and will be so considered by us, and are as follows:

"1. The herein described method of forming a sheet or slab of rubber which consists in superposing one upon the other a plurality of plies of rubber compound, one ply containing sulphur and an adjoining ply an accelerator."

"7. The hereinbefore described method of effecting the vucanization of rubber compounds which consists in incorporating with the rubber compound one of two ingredients which will coact to effect vulcanization, applying the other ingredient to the surface of the rubber compound, and thereafter causing the surface ingredient to penetrate the rubber and coact with the first named ingredient to effect vulcanization."

It was at first contended by Harrison and Morton that Cadwell could not make the counts. The Law Examiner, the Examiner of Interferences, and the Board of Appeals found to the contrary, and the correctness of their conclusions in this regard is not seriously disputed here.

Harrison and Morton, being the junior parties, in order to show priority, were required to produce and did produce evidence. Later appellee introduced rebuttal evidence. Upon the record, the Examiner of Interferences found that Cadwell was prior in conception and disclosure, but gave priority of reduction to practice to Harrison and Morton, and therefore awarded priority of invention to appellants. The Board of Appeals reversed the Examiner of Interferences, found that Cadwell was first to reduce to practice and awarded priority of invention to him.

The sole question presented here, therefore, is: Upon the record, was the Board of Appeals justified in awarding priority of reduction to practice to appellee, Cadwell? In order to understand the contentions of the parties as respects this issue, it will be helpful to consider for a moment the art of vulcanizing rubber at the time the two opposing parties herein undertook the solution of the problem which resulted in the invention in dispute.

Crude rubber possesses some elasticity and tensile strength. It is lacking in many qualities desirable for commercial articles, particularly in that it is affected by temperature variations, when cooled becoming more brittle and harder, and when heated becoming soft and plastic. It was early discovered that by incorporating sulphur with rubber, and by heating the mixture at a relatively high temperature (286° F. or higher) and for a relatively long time, its properties were favorably changed, in so far as its elasticity, tensile strength, and other desirable properties were greatly increased. It was then not affected, as above indicated, by temperature changes, and was not soluble in organic solvents. This was early styled "vulcanization" or "curing." The amount of sulphur in a rubber compound is comparatively small—from 2 to 10 parts of sulphur to 100 parts of rubber. It was later discovered that, by the addition of certain inorganic substances to the rubber and sulphur, the time and temperature required to produce vulcanization were considerably decreased, and in more recent years it was also discovered that certain organic substances known as high-power or low-temperature curing accelerators, when mixed with the compound, further reduced the time and temperature required for vulcanization. The use of these accelerators, however, was fraught with danger and inconvenience, since the low temperature at which, and the quickness with which, the vulcanization or curing was brought about by the accelerator caused frequent burning in the mill.

The milling consisted of taking the crude rubber which was tough and almost inelastic, though somewhat flexible, and incorporating with it the other compounding ingredients and "breaking it down" or working it into a plastic condition by running it through a mill consisting of rolls. During the milling operation it was squeezed, mixed, kneaded, pulled apart and stretched until the mass became plastic and its original nature almost completely changed. The rolls of a standard mixing mill are about five feet long and two feet in diameter and handle in one operation a batch of rubber weighing about 150 pounds. The operation requires approximately forty to fifty minutes. The friction generated in the mill raises the temperature of the compound to approximately 200° F. After this compound has been mixed, it is usually placed in the stockroom of the factory.

When it is needed for manufacturing purposes, a sufficient amount is taken from the stockroom and warmed up in the mill substantially in the manner in which it was mixed. It is then taken to a calendering machine and run between two heated rolls accurately spaced apart to produce a sheet of the thickness desired. Rubber blanks are then cut from the sheet. The scrap from this

operation is put back with the original batch. Up to this point it will be seen that it is very important that the material not "set up" or that incipient vulcanization should not have occurred. To vulcanize such a stock requires a period of three or four hours and a temperature of approximately 270° F. to 300° F.

The high-power accelerators were well known in the art when the parties hereto made their respective inventions. Both recognized that there was a great advantage in the use of high-power accelerators in so far as very rapid vulcanization would result from the use thereof and thereby yield a vulcanized product having an exceedingly high tensile strength and other very valuable physical characteristics. These powerful accelerators, it is admitted, will coact with sulphur at a temperature materially below the melting point and even below the temperature commonly obtained by the compound in the mixing mills and calenders. Because the powerful accelerators would effect vulcanization in the presence of sulphur below the temperature which the compound reached in the milling, warming up and calendering operations, no great field of usefulness appeared for them. How to use them to advantage in vulcanization was the problem of the inventors herein. The problem was solved by both parties in an exceedingly simple way, and solved so completely as to obviate all difficulty in the use of the high-power accelerators. The solution rested in the recognition of the fact that sulphur will migrate at a low temperature, and also that certain of the accelerators would also migrate at a low temperature.

As affects count 1 and the first of the Harrison and Morton patents, the process consisted of making two companion plies of compound. In one would be the sulphur and other ingredients *without* the high-power accelerator. In the other would be rubber and other ingredients *with* the high-power accelerator. They could be produced and kept in stock indefinitely. To form a sheet or slab of rubber, the two plies were taken from stock and one superimposed upon the other, or a great number of plies might be put together. The sulphur would migrate into the plies containing the high-power accelerator, and the high-power accelerator would migrate into the plies containing the sulphur, and curing or vulcanization would then take place.

As affects count 7 and the second patent of Harrison and Morton, which is the single ply method, a single ply containing all the ingredients except the high-power accelerator was made, and later, when needed, the accelerator was dusted onto the ply, or the ply was dipped into a liquid accelerator, or the accelerator was applied by gas or spray. The migratory nature of the accelerator caused it to enter the rubber compound, and curing or vulcanization then took place.

It is the contention here on the part of the appellants that the Board erred in awarding priority of reduction to practice to appellee, inasmuch as, according to appellee's contention, his reduction to practice consisted in the mixing entirely on a laboratory mill and in attempts to vulcanize rubber not made into the finished article. Appellants argue that the laboratory mixing mill, the rolls of which were twelve inches wide and six and eight inches in diameter, handling a little over two pounds of rubber, was insufficient to demonstrate factory or commercial conditions under which the vulcanization sought was to take place, and that, unless the vulcanization took place in the act of making the article, no proper test was given which would show a commercial success, and that therefore there was no reduction to practice.

The appellee offers evidence of 200 independent tests covering a long period of time. His mixing was done on a laboratory mill exclusively. He made many different articles which are before us as exhibits. Appellee argues that the invention was a process of vulcanizing rubber, and that the vulcanization was completely demonstrable without the necessity of commercially manufacturing the articles, and that he practiced the vulcanization of rubber by his process on many different articles with a view of determining which of the many rubber articles manufactured by his employer should be made by this process.

The Examiner of Interferences (before the decision of the United States Supreme Court in Corona Cord Tire Company v. Dovan Chemical Corp., 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610) held that Cadwell had not established a commercial scale performance of the method nor a successful performance even on a laboratory scale. He regarded the laboratory process as practiced and laboratory tests made as insufficient to constitute reduction to practice.

After his decision, and before the decision of the Board of Appeals, the United States Supreme Court handed down the decision in the case of Corona Cord Tire Co. v. Dovan Chemical Corp., supra, in which Chief Justice Taft, speaking for the court, in the course

of the opinion, had the following to say at page 367 of 276 U. S., 48 S. Ct. 380, 382:

"A 'cure' is the successful completion of the chemical union or vulcanization of the rubber with the sulphur. The fact of a successful 'cure' for practical purposes is established by a simple and short method called the thumb and tooth test. By this test, rubber chemists settle the fact and determine by the resulting product the satisfactory quality of the stock or the mix for vulcanization and they become expert at it. If by this test the product is not well united chemically, it is said to be 'under cured' or 'over cured,' and then the operator changes the ingredients or the time of the process. When it is important to determine with greater exactness the tensile strength and degree of elasticity or other qualities of the product, a special machine measure or test is used, but the thumb and tooth test is the frequent way of knowing a cure, and it is a satisfactory one for everyday use in business,"

—and at page 382 and page 383 of 276 U. S., 48 S. Ct. 380, 387:

"This constitutes priority in this case. It was not followed by commercial use thereafter, because of the then cost of D. P. G. But this patent is for the mere discovery and application in the making of rubber of a particular accelerator. It was the fact that it would work with great activity as an accelerator that was the discovery, and that was all, and the necessary reduction to use is shown by instances making clear that it did so work, and was a completed discovery. Bedford v. Hunt, 1 Mason, 302, Fed. Cas. No. 1217, 3 Fed. Cas. 37; Reed v. Cutter, 1 Story, 590, Fed. Cas. No. 11,645, 20 Fed. Cas. 435; Gayler v. Wilder, 10 How. 477, 13 L. Ed. 504; Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821.

"It is said that these tests of Kratz were mere abandoned laboratory experiments. There was no abandonment in the sense that Kratz had given up what he was seeking for in demonstrating a new and effective accelerator in D. P. G. If he had been applying for a patent for the discovery he clearly could have maintained proof of a reduction to practice. A process is reduced to practice when it is successfully performed. A machine is reduced to practice when it is assembled, adjusted and used. A manufacture is reduced to practice when it is completely manufactured. A composition of matter is reduced to practice when it is completely composed. Walker on Patents, § 141a; Hunter v. Stikeman, 13 App. D. C. 214, 226; Mason v. Hepburn, 13 App. D. C. 86, 92; Lindemeyr v. Hoffman, 18 App. D. C. 1, 5; Roe v. Hanson, 19 App. D. C. 559, 564."

On page 384 of 276 U. S., 48 S. Ct. 380, 388 of the same case we find the following:

"Kratz's method of testing his rubber slabs is criticized. As already said, it is the method known as the thumb and tooth test. This is not so exact a method in determining all the qualities that a test machine would show in the product, but it is, as already said, one very generally used for practical purposes in factories in determining that the vulcanization or cure is complete. * * *

"It is a mistake to assume that reduction to use must necessarily be a commercial use. If Kratz discovered, and completed, as we are convinced that he did, the first use of D. P. G. as an accelerator in making vulcanized rubber, he does not lose his right to use this discovery when he chooses to do so for scientific purposes or purposes of publication or because he does not subsequently sell the rubber thus vulcanized or use his discovery in trade or does not apply for a patent for it. It is not an abandoned experiment because he confines his use of the rubber thus produced to his laboratory or to his lecture room."

Soon after this decision was handed down, the Board of Appeals reversed the Examiner of Interferences and cited this case, together with Nikaido v. Bruni, 1925 C. D. 154, 341 O. G. 837. In the decision of the Board of Appeals, Exhibits 14, 40, 34, and 89 were held to be evidence of reduction to practice as to counts 1 to 6, inclusive, while Exhibits 57 and 36 were cited as evidence of reduction to practice of the subject-matter of counts 7 to 11. It will not be necessary for us to discuss the various exhibits very much in detail. They were discussed at great length in the opinions of the Patent Office tribunals and in the briefs of the parties.

### Exhibit 3.

Cadwell's first conception was January 21, 1920, when he made an experiment, Exhibit 1, using oxy-ethyl thiocarbonic acid disulphide (X Z A) in one sheet and aniline in the other, and on the morning of January 22, 1920, he wrote up his notes and disclosed his discovery. In the testimony three pieces of rubber, prepared in the above-described manner, were identified by him as being prepared by him on January 22, 1920—Exhibit 3. This incident of his testimony was corroborated by W. A. Steinle. Exhibit 6, "Tensile Test Data," shows Exhibit 3 was tested on a machine and had a tensile test of 2732.

The Examiner of Interferences held that these exhibits were not evidence of reduction to practice, chiefly upon the ground that example 8 of the Cadwell specification was inoperative, and that a mixture of these substances would burn in the mill. The Board doubted if these exhibits were sufficient basis for Cadwell's claim for reduction to practice.

### Exhibit 14.

Exhibit 14 is made up of sheets of rubber, one containing rubber, zinc oxide oxy-normal butyl thiocarbonic acid disulphide (C P B) and sulphur and the other ply containing rubber, zinc oxide, red oil (aniline), and sulphur. The Board said: "There is no contention that either of these batches would burn on the mill nor that the C P B will not migrate, this being admitted by Harrison and Morton." The Board found that Exhibit 14 appeared to be well vulcanized, and that no objection had been raised by appellant to this fact. Coe testified that "they are cured." As far as we have observed, there is no testimony in the record as to what kind of test was given to this exhibit.

### Exhibit 40.

Exhibit 40 represents Cadwell's attempt to utilize his process of vulcanization to the making of pneumatic tires. He produced a number of flexing pads in which alternate plies of disulphide and aniline stock were used, the disulphide being X Z A. Strips from these pads were tested on a flexing machine and found satisfactory. This testimony of Cadwell's was corroborated by Steinle. The Examiner of Interferences held that this work did not establish reduction to practice because these strips were only tested by the "rule of thumb" test "such as pulling in the hands, prodding with a pencil, or mere visual inspection," and were not tested against a standard pad. The evidence shows that they were tested by men skilled in the rubber art to determine if they were properly vulcanized and suitable for use as tires. In view of the Corona Case, supra, we hold that, since the goods were otherwise properly tested for vulcanization, the test required by the Examiner of Interferences was not necessary.

### Exhibit 34.

Exhibit 34 was a solid automobile tire in which C P B and aniline were used in alternate plies. The tire was vulcanized by hanging it up in a room at a temperature of 100° F. for seven days. Coe testified that the vulcanization was good. The only objection to this exhibit seems to be that Cadwell had nothing to do with it. The Board found that the work of the employee Coe under Cadwell inured to the benefit of the inventor.

### Exhibit 89.

Curtis, assistant to C. E. Bradley, director of the general laboratories of the U. S. Rubber Company, produced a printer's roll, or what appears to be a part of one, Exhibit 89, formed from alternate plies containing C P B and aniline, which involved the mixing and calendering of a comparatively large amount of rubber. Curtis testified that the stock cured well and was very satisfactory. The Board again said:

"No one contends that either of these stocks would burn in the mill and it is admitted that sulphur and C P B will migrate. This exhibit 89 clearly embodies counts 1 to 6, inclusive, of the issue and we see no reason why reduction to practice is not established by the work done on Exhibits 14, 40, 34 and 89, all of which was prior to Harrison and Morton's reduction to practice of these counts on November 11, 1920. The Examiner of Interferences denied Cadwell a reduction to practice on the grounds that he worked almost entirely on small quantities of rubber and that the method could not be properly tested out without milling batches of 100 pounds or more in a commercial mill instead of in a small laboratory mill, and he further held that tests by stretching, prodding with a lead pencil, etc., were not sufficient. Exhibits 34 and 89 required the handling of considerable amounts of rubber, as admitted by the Examiner of Interferences, but he held that these exhibits were not tested. At least, they showed that the composition used could be milled in large batches without burning, and the fact that they were well cured is testified to by men who should have known. No specific tests are described, but an experienced rubber man can determine by inspection and handling whether rubber is properly vulcanized, and presumably and inevitably, Curtis and Barrett made these ordinary tests such as are described in connection with other articles, see Steinle, Q. 74, page 681, XQ. 212, page 722, Cadwell, page 371, XQ. 736, before forming the conclusion that the rubber was properly vulcanized."

As to this exhibit, we agree with the conclusion reached by the Board.

### Exhibit 57.

Cadwell testified that about July 1, 1920, he prepared a stock containing rubber, zinc oxide, lithopone, sulphur, and C P B which

was wound into a roll about two inches in diameter and placed in a closed receptacle which contained aniline. The stock was allowed to stand in this receptacle for about six weeks or more, and from time to time was examined to determine how far the aniline had penetrated into the rubber. As it penetrated the stock, the rubber was vulcanized. It was better cured in the center than on the surface. It was tested by prodding it with a lead pencil and by inspection. The testimony of Cadwell was corroborated by Steinle. The rejection of the Examiner of Interferences was based upon the quantity of rubber used. The Board concluded that the Examiner of Interferences did not take into consideration the proposition that this established clearly that C P B is migratory, and that, if it was, the same formula and process could be used on commercial quantities without scorching or burning in the rolls. We agree with the Board as to the weight to be given this testimony.

### Exhibit 36.

This is an inner tube for a tire in which Coe used a compound of zinc, C P B, and sulphur which was calendered in sheet form, rolled about a mandrel, and painted with aniline. The tube was removed from the mandrel, inflated with gas and water, and heated. This exhibit was made September 24, 1920. The Board found that it was well vulcanized, and cited Nikaido v. Bruni, supra. Bradley supported the testimony of Coe.

There are many other exhibits which have been discussed and to which objections have been made, among them a finished slipper. It is not necessary for us to discuss them, since we are certain that sufficient tests were made on these many exhibits to prove conclusively that proper vulcanization would result from the migrations of the various ingredients. That none of these tests found their way into the finished commercial product for many months does not argue that there was no reduction to practice. These operations took place in the laboratories of a large and responsible rubber concern. Much time was spent, and we think properly so, in determining the different kinds of articles which could be most suitably and profitably made by the use of the new process.

The record shows that appellee's rubber, which was vulcanized by the process here in dispute, was tested in the usual way for determining proper vulcanization, and which test was in common use in the rubber laboratories of the country. It was tested by the thumb and pencil method and by the stretching method. These tests were sufficient to prove conclusively the character of vulcanization attained. If laboratory tests and laboratory construction of inventions were to be rejected in cases of this kind, it would seem to us that it would lead to very grave consequences for future inventions. It may be that there are in the field of invention certain articles in which laboratory tests and laboratory manufacturing would hardly be regarded as a reduction to practice, but we do not think vulcanization of rubber can be placed in that class.

Some of the articles in controversy here were stretched on stretching machines to determine the resistance to strain; some of them were stretched to determine flexibility and tensile strength. It would seem that it would be very difficult to apply a machine flexibility test to a finished slipper or other finished commercial article, and certainly it is not required that the slipper should be worn for a certain length of time in order to constitute reduction to practice of vulcanization of the rubber contained therein. True enough, those who contemplate great expenditures in manufacturing establishments and equipment oftimes apply many different tests in order to determine the commercial expediency of wholesale manufacture, but, because this is a practice among careful and responsible manufacturers, it does not follow that such a practice is the measure by which the patent tribunals should determine the question of reduction to practice in a case like that at bar.

In conclusion, we think it sufficient to say that the invention in this case does not lie in the invention of a rubber slipper or other finished similar commercial articles. The invention claimed is for a process of vulcanizing rubber. The lack of factory tests and the failure to engage in wholesale commercial manufacture and other suggestions of appellants' able counsel might, under some circumstances, be considered by a court in order to test the credibility of witnesses or to determine whether a litigant really did the things he claimed to do. It might also have weight on the question of abandonment. In this case there is not the slightest insinuation that one litigant knew anything about the operations of the other during the period of investigation, testing, etc. The experimental plants were far removed from each other. The high standing and scientific attainments of appellee's witnesses is not questioned, and their testimony is of the kind which is diffi-

cult to fabricate. It is of the character that imports verity. No abandonment is shown by this record. As to all the counts, appellee was first to conceive, first to reduce to practice, and first to file in the Patent Office. His diligence, argued at length in the briefs, is therefore beside the question.

The Board correctly reversed the Examiner of Interferences and awarded priority of invention to the appellee, and its decision is affirmed.

Affirmed.