26 C.C.P.A.(Patents)

### KYRIDES v. BRUSON.
#### Patent Appeal No. 4005.

Court of Customs and Patent Appeals.
March 13, 1939.

BLAND, Associate Judge, dissenting in part.

Joseph R. Mares, of St. Louis, Mo. (John D. Pope, III, of St. Louis, Mo., on the brief), for appellant.

Robert Ames Norton, of Stamford, Conn., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Examiner of Interferences awarding priority to the party Bruson upon seven counts of an interference, which counts read as follows:

"Count 1. The benzyl ester of benzoyl benzoic acid.

"Count 2. The compound, 2-benzoyl-1-benzyl-benzoate.

"Count 3. Benzylbenzoyl-benzoate having the following formula:

$$COOCH_2C_6H_5$$

"Count 4. Cyclohexanyl benzoylbenzoate having the following formula:

$$COOC_6H_{11}$$

"Count 5. An ester of a benzoyl benzoic acid and a cyclohexanol.

"Count 6. An ester of benzoyl benzoic acid and a partially substituted dihydric alcohol.

"Count 7. An ester of benzoyl benzoic acid and an alkyl ether of ethylene glycol."

The counts are all for a composition of matter and define an ester which is produced by combining benzoyl benzoic acid with an alcohol. The counts differ in that in some of the counts a different alcohol is combined with the benzoyl benzoic acid. Counts 1, 2 and 3 relate to the benzyl ester of benzoyl benzoic acid. The board treated these counts as a separate group and we will do likewise. Counts 4 and 5 relate to the cyclohexyl ester of benzoyl benzoic acid and form the second group, while counts 6 and 7 relate to esters of partially substituted dihydric alcohols, and comprise the third group. The esters are used in plastics and resins such as nitrocellulose and acetyl cellulose, and are characterized by having low melting points, high boiling points and other desirable features necessary in a plasticizer.

The interference is between two applications, that of Bruson being filed on October 3, 1929, and that of Kyrides being filed on October 5, 1929. Both parties took testimony.

The Examiner of Interferences held that the proofs of Bruson, the senior party, showed that he conceived the invention of all the counts in January, 1929; that he had reduced to practice the invention of counts 1, 2 and 3 at least as early as May 13, 1929 (prior to any date alleged by Kyrides), and that as to counts 4 to 7, inclusive, he had constructively reduced to practice by filing his application on October 3, 1929. The Examiner of Interferences further stated that since Bruson admitted conception by the party Kyrides of the invention in issue as of the first week in August, 1929, with subsequent reduction to practice in August and September, 1929, the burden was on Bruson to show reasonable diligence as to the invention covered by counts 4 to 7 from just prior to August 1929 (when Kyrides entered the field) until Bruson's constructive reduction to practice on October 3, 1929. After reviewing the testimony of Bruson, the examiner held that Bruson showed no lack of diligence as to counts 4 to 7, inclusive. He therefore awarded priority of invention in all the counts at bar to Bruson.

The Board of Appeals stated that the Examiner of Interferences had held that the party Kyrides had established the following dates: "Conception as to all counts Aug. 1, 1929; reduction to practice of Counts 1, 2 and 3, August 15, 1929, Counts 4 and 5, October 5, 1929 (filing date) and Counts 6 and 7, August 27, 1929." and that this holding was not seriously questioned by Bruson. Bruson in this court concedes that these dates are correct.

As to counts 1, 2 and 3 the board stated that the Examiner of Interferences had held that Bruson had conceived and re-

duced to practice as early as January, 1929. As pointed out above, the examiner held that Bruson had conceived the invention of these counts in January, 1929, and reduced to practice at least as early as May 13, 1929. Both dates being earlier than any claimed date of Kyrides, the inadvertent statement of the board that the examiner held Bruson to have reduced to practice in January, 1929, is immaterial.

The principal question before the board as to counts 1, 2 and 3 was whether Bruson had reduced to practice the invention there involved by the production of the ester defined therein, it not being shown that he at any time actually proved the utility of the invention by using it as a plasticizer. The board, after stating that in a prior decision during the prosecution of the interference it had held these counts to be patentable, said: "We do not feel that an applicant should be required to restrict his claims to some particular use of a new ester. The ester defined in the counts had admitted utility and it seems to us that like other manufactured products, for instance, alloys and compositions of matter, it may be claimed broadly." For this reason the board held that the invention involved in counts 1, 2 and 3 was reduced to practice when the ester was completed.

The board held that as to the remaining counts the Examiner of Interferences correctly awarded Bruson as early as January, 1929, for conception, stated that he had been diligent from that date until he filed his application on October 3, 1929, and accordingly affirmed the holding of the examiner awarding priority to Bruson.

■ As to counts 4 and 5, Kyrides in his preliminary statement claims no date earlier than his filing date, October 5, 1929, for reduction to practice. He therefore is in the position of being the last to conceive and the last to reduce to practice. Under such circumstances, Bruson is under no obligation to make a showing of diligence. As to these counts, if we find that Bruson conceived in January, 1929, we must affirm the board.

As to counts 6 and 7, if we find that Bruson conceived in January, 1929, and was diligent from just prior to the time Kyrides entered the field until his (Bruson's) filing date, we must affirm the board, notwithstanding the fact that as to these counts Bruson admits that Kyrides was the first to reduce to practice.

It is conceded by the party Kyrides that the party Bruson was prior in conception as to all seven counts. The broad issues before us, therefore, as has been indicated, relate to reduction to practice and diligence.

With respect to the first group (counts 1, 2, and 3) counsel for Kyrides contend that Bruson failed to establish reduction to practice at any time prior to the Kyrides date of August 15, 1929. This contention is predicated upon two allegations. The first is that there is no corroboration of Bruson's testimony as to the actual preparation of the ester; the second is that there is no showing of a test of the ester.

■ It is not deemed necessary here to dwell at length upon the first of the foregoing allegations. The Examiner of Interferences reviewed the testimony of Bruson and the witnesses called in his behalf, together with the exhibits filed as evidence, and concluded that there was corroboration as to the preparation of the particular ester defined in the counts and held that Bruson was entitled to a date "at least as early as May 13, 1929," for reduction to practice. The board made an independent review and concurred. So, we have concurring decisions upon a question of fact. From our own examination of the record, which has been made with care, we do not feel justified in holding that this finding was erroneous.

■ Upon the second allegation above noted, relating to the matter of test, it is urged that there is no proof of a test and that "the invention could not be considered complete until the ester resulting from the process was tested and found to have an unexpected quality distinguishing it from the prior art, or, in other words, that the ester was patentable."

The views of the board respecting this contention have been quoted, supra.

In presenting the case before us counsel for Kyrides relies strongly upon the case of Bethlehem Steel Co. v. Churchward I. Steel Co., 3 Cir., 268 F. 361, where the validity of patent claims was under consideration. It was there held that the alloy defined by the claims was not shown to possess such new and additional properties over the prior art alloys as to lend validity to the patent claims. That case does not relate to reduction to practice of

an invention but to a lack of proof of such facts as would show invention. We find nothing in it to suggest that where one invents a composition of matter which is new and which is of admitted utility and proceeds to file his application for a patent therefor, he should not be held to have reduced the invention to practice when he has completed the preparation of the same and produced a new ester which is known to have utility.

Counsel for Kyrides also relies upon the case of Reichel v. Dorset, 49 App.D.C. 198, 262 F. 652, which related to a new substance, hog cholera globulin. The Court of Appeals of the District of Columbia held that, without a test of its potency in immunizing a hog, the invention could not be considered to have been reduced to practice. This case is easily distinguishable for the reason that while the material there was a new substance, it could not possibly be determined whether it would have any effect whatever on a hog until a test had been made.

The ester of the first three counts was of that character of compound whose utility was known, and the problem was in producing it. The invention rested largely, if not wholly, in discovering that benzoyl benzoic acid when mixed with an alcohol would form an ester. If the ester was formed, it was known to have utility as a plasticizer.

While Bruson has cited no authorities supporting his contentions on the subject, it seems to us that the decision of this court in Larson et al. v. Eicher, 49 F.2d 1029, 1031, 18 C.C.P.A., Patents, 1497, is very much in point on this question. The invention there involved was cod-liver oil tablets and the method of making them. The problem confronting the inventor was to put the active extracts of cod-liver oil in the form of a dry medical agent. It was contended there that the production of the article in the performance of the process was not a reduction to practice. In holding that the performance of the process and the production of the article was a proper reduction to practice under the law this court said:

"It appears from the record that, in the manufacture of his tablets, appellee used cod liver oil extracts known as 'Gaduol' and 'Jeccoral,' which were in extensive use commercially and known to possess therapeutic properties. So the real problem confronting appellee was to put the active extractives of cod liver oil into the form of a dry medicinal agent. Having conceived this idea and having actually produced cod liver oil tablets, it was not necessary that any given number of the tablets contain a particular quantity of active extracted ingredients of cod liver oil. The counts are not so limited. Nor was it necessary that appellee exploit his invention in order to complete it.

"Appellee was an experienced chemist. He knew the therapeutic value of the ingredients in the tablets he manufactured, and, having successfully performed the involved process, and produced the involved product, which he did in March or April, 1920, he had reduced the invention to practice. Marion M. Harrison and Harold A. Morton v. Sydney M. Cadwell, 39 F.2d 704, 17 C.C.P.A. [Patents] 1024, and cases therein cited; St. John et al. v. Schulze, 47 F.2d 798, 18 C.C.P.A. [(Patents) 1050]. * * *"

The language used there is apropos of the situation at bar. Having produced an ester which up to that time had not been thought possible of production, Bruson, as a skilled chemist, familiar with the nature of esters produced by the combination of alcohols and acids knew what it would do and was not required to put it to its intended use.

While the facts in the case of Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610, are hardly on all fours with those of the case at bar, certain language used therein would seem to be quite in point on the instant issue. The court there said (page 383, 48 S.Ct. page 387): "It is said that these tests of Kratz were mere abandoned laboratory experiments. There was no abandonment in the sense that Kratz had given up what he was seeking for in demonstrating a new and effective accelerator in D. P. G. If he had been applying for a patent for the discovery he clearly could have maintained proof of a reduction to practice. A process is reduced to practice when it is successfully performed. A machine is reduced to practice when it is assembled, adjusted and used. A manufacture is reduced to practice when it is completely manufactured. A composition of matter is reduced to practice when it is completely composed. Walker on Patents, § 141a; Hunter v. Stikeman, 13 App.D.C. 214, 226; Mason v. Hepburn, 13 App.D.C. 86, 92; Lindemeyr v. Hoffman, 18 App.D.

C. 1, 5; Roe v. Hanson, 19 App.D.C. 559, 564."

We are therefore of the opinion that as to the invention involved in counts 1, 2 and 3, Bruson had conceived and reduced the same to practice before any date claimed by Kyrides.

Counsel for Kyrides has argued that as to counts 4 and 5, as well as counts 6 and 7, Bruson must show diligence from just prior to the time Kyrides entered the field, August 1, 1929, to his (Bruson's) filing date. As to counts 4 and 5, it being our view that the Patent Office tribunals were correct in holding that Bruson was the first to conceive the invention of all the counts (and this is conceded by Kyrides), and since he was the first to reduce to practice, both parties relying on their filing dates for such reduction, there is no question of diligence involved, and Bruson was properly awarded priority therein. See Rivise "Interference Practice," Sec. 151; "Underwood's Interference Practice," Sec. 74, note 2, and cases cited; and McCrady "Patent Office Practice," Sec. 388.

As to counts 6 and 7, Bruson has conceded that Kyrides reduced his invention to practice August 27, 1929. This is prior to Bruson's filing date (October 3, 1929). Bruson does not seriously contend that he made any other reduction to practice of the invention of counts 6 and 7 except by filing his application. Notwithstanding the fact that Bruson was the first to conceive, he, being the last to reduce to practice, must necessarily show diligence from just prior to the time Kyrides entered the field until he, Bruson, filed his application.

As has been stated, Kyrides is conceded to have entered the field August 1, 1929 (that date being awarded him for conception of all the counts), and for reduction to practice of counts 6 and 7 he was awarded, and is conceded, the date of August 27, 1929. It was, therefore, incumbent upon Bruson to show diligence with respect to these counts from just prior to August 1, 1929, until his filing date of October 3, 1929.

A careful examination of the record leads us to the conclusion that he has failed to establish such diligence.

Considerable stress has been placed upon an experiment made by Bruson in April 1929, the board saying:

"In his [Bruson's] notebook, Exhibit A, there is a description under the date of April 16, 1929 of the preparation of the di-ethylene glycol ester. Bruson has testified that since this ester was found to be thick and viscous he suspected that the ethyl cellosolve when reacted with benzoyl benzoic acid would probably give a thinner and more suitable product, and that he, therefore, ordered a comparatively large quantity of ethyl cellosolve on April 26, 1929. See Exhibit D. Bruson has also stated that his work at that time was such that he could not make a complete survey of all the esters of benzol benzoic acid that could be made from alcohols readily available at that time, and, therefore, employed Dr. Robinson to complete the survey. Robinson's notebook which has been filed as Exhibit C and properly identified, shows that he repeated Bruson's experiments with regard to the benzol diethylene glycol and the cyclohexyl esters and then on September 26, 1929 his notebook shows that he made the cellosolve ester of benzoyl benzoic acid. The Examiner of Interferences has held that the work of Bruson as shown by the notebooks filed, and also the work of Robinson which was done under the direction of Bruson clearly shows that Bruson was diligent from the date of conception, January 1929, until he filed his application on October 3, 1929. Bruson has testified that it was impossible to determine before hand which one of the many esters that could be produced from available alcohols would be the most valuable and it was merely by chance that cellosolve was not reached until comparatively late in the work done by Robinson under the direction of Bruson, for it clearly came within the outline given to Kirsopp, Rollhaus and Vogel."

It will be observed that there is no finding in the foregoing statement of anything actually done by Bruson, with respect to the particular esters defined in counts 6 and 7, between the April 16th experiment and the time of Kyrides entry into the field.

The brief on behalf of Bruson states that he "tested out a *close relative* to the esters" (italics ours) of this group in the April experiment and again in July; that Dr. Robinson began his employment as Bruson's assistant August 6, 1929, and "cleaned up a few laboratory odds and ends and then began the systematic production of a whole long series of esters of

benzoyl-benzoic acid," making, between August 6 and October 3, 1929, some twenty-three esters. It is further said in the brief that "Robinson was not given any instructions as to which ester he should make first and, of course, at that time no one had any idea that the present interference would be declared." The record supports these contentions but the particular esters of the involved counts do not seem to have been produced by Robinson until the latter part of September, about a month after Kyrides had produced them, and nearly two months after Kyrides had entered the field.

Dr. Bruson testified on cross-examination that he and his associates were engaged during the period from October, 1928, to August, 1929, in making many types of esters, compounds which were not esters, resins which might or might not have been esters, balsams of various sorts, and in testing various metallic salts of organic acid. All that was shown to have been done with respect to the esters of counts 6 and 7, however, has been epitomized above.

It is our view that what was done with respect to other esters and materials may not properly be held to constitute diligence with respect to the particular esters involved.

Upon the record presented we think Kyrides is entitled to an award of priority as to counts 6 and 7.

Accordingly, the decision of the board is modified, being affirmed as to counts 1, 2, 3, 4, and 5 and reversed as to counts 6 and 7.

Modified.

BLAND, Associate Judge (dissenting in part).

I think that the tribunals of the Patent Office were right in holding that there was no lack of diligence on the part of Bruson shown by the record with reference to the invention of counts 6 and 7. Obviously, Bruson could not make all the tests at one time. Many different experiments in combining many different acids with many different alcohols were required. He employed Robinson and was assured he would be present to help in the experimentation. Robinson came and went to work within a few days after Kyrides entered the field. Bruson continued to experiment with different materials for the purpose of creating esters to be used for the same purpose. The fact that he, on the identical day on which Kyrides entered the field, was not engaged in experimenting with the particular acid or alcohol defined by the counts seems to me to be immaterial. If Robinson had been at work on the date when Kyrides entered the field, it is probable that he would not have been engaged in experimenting with the particular acids involved in the counts.

As I see it, Bruson, at the critical time, was engaged in perfecting his broad invention, and he had taken the diligent step of securing Robinson's services in finishing the task. The mere fact that neither of them is shown by the record to have been engaged in experimenting with the particular acid or alcohol involved does not justify the conclusion that there was a lack of diligence on Bruson's part such as would warrant an award of priority to one who is clearly the second inventor. This is not like a case where a single object requires testing and is laid aside for insufficient reason or without explanation.