**AMERICAN MACHINE & FOUNDRY COMPANY, Plaintiff,**

v.

**LIGGETT & MYERS TOBACCO CO., Defendant.**

Civ. A. No. 1032–57.

United States District Court
D. New Jersey.

Jan. 9, 1959.

As Amended Jan. 20, 1959.

McCarter & English, by Verling C. Enteman, Newark, William J. Barnes, William A. Drucker, New York City, of counsel, for plaintiff.

Pitney, Hardin & Ward, by Frank C. O'Brien, Newark, N. J., Kenyon & Kenyon, by W. Houston Kenyon, Jr., New York City, James H. Callahan, New York City, of counsel, for defendant.

FORMAN, Chief Judge.

This action is brought by the American Machine & Foundry Company against Liggett & Myers, both New Jersey corporations, hereinafter called AMF and L&M respectively, to obtain a judgment pursuant to 35 U.S.C. § 146 entitling AMF to a patent now held by L&M. An Interference proceeding has been decided adversely to AMF by the Board of Patent Interference Examiners, hereinafter called the Board, within 60 days of the filing of this suit, and no appeal is pending before the Court of Customs and Patent Appeals. Jurisdiction and venue are had under 28 U.S.C. §§ 1338(a) and 1391(c).

Involved before the Board were (1) an application of Dr. David Bandel, Serial No. 468,270, filed November 12, 1954, for "Tobacco Sheet Material and Method of Forming"; (2) United States Patent No. 2,708,175[1] of May 10, 1955, for "Composition of Matter consisting Chiefly of Fragmented Tobacco and Galactomannan Plant Gum" for which application Serial No. 433,062 had been filed May 28, 1954, by Max M. Samfield et al., and (3) another application by Dr. Bandel designated "Continuation in Part" application to that of Serial No. 468,270 filed July 14, 1955, Serial No. 521,984.

Dr. Bandel was a research chemist in the employ of AMF to whom he assigned his applications. Max Samfield et al. were employees of L&M, which now holds the patent by assignment.

In his application No. 521,984 of July 14, 1955, Dr. Bandel set up Claims 1 and 3 in language identical to that used by Max Samfield et al. in Claims 1 and 3[2] of their patent No. 2,708,175, issued May 10, 1955, as follows:

"1. A composition of matter suitable for smoking consisting by weight of a minor proportion, about 1% to 20%, of a plant gum consisting essentially of galactomannan, approximately 9% to 13% of moisture, and the balance essentially all dry-ground tobacco with the individual finely-divided fragments thereof cohered together so as to have, when formed in sheets of about the thickness of natural leaf tobacco, a tensile strength approximately equal to the tensile strength of such leaf tobacco."

The only change in Claim 3 was to substitute "locust bean gum" for "galactomannan."

On the basis of the identical character of the claims, the United States Patent Office declared Interference No. 87,744,[3] in which Claims 1 and 3 became Counts 1 and 2 respectively.

Each count sets forth the following requirements, viz., (1) a composition of matter, (2) suitable for smoking, (3) consisting by weight of a minor proportion about 1 to 20% of a plant gum consisting essentially of galactomannan, (4) approximately 9% to 13% of moisture, (5) the balance essentially all dry-ground tobacco, (6) the mass so cohered as to have, when formed in sheets of about the thickness of natural leaf tobacco, (7) a tensile strength equal to that of such leaf tobacco.

After due proceedings, in which both parties were represented by counsel, but at which only Dr. Bandel, the junior party, introduced testimony, the Board awarded priority to Samfield. That opin-

---

1. L&M now owns the reissue of this patent under Re 24,424 issued February 4, 1958, upon reissue application of March 1, 1956, Serial No. 568,956.

2. Although AMF alleges that Dr. Bandel's Claims 1 and 3 were copied verbatim from the Samfield patent, the word "mois-

ture" appearing in the former is in lieu of the word "water" which appears in the latter.

3. One Joseph H. Carter, Jr., of Raleigh, N. C., was also made a party to the interference but abandoned his application.

ion, together with the transcript and exhibits, was received in evidence at this trial.

In the manufacture of cigarettes a certain amount of tobacco, apparently significant, is broken from the natural leaves during processing and cannot thereafter be used unless reclaimed. Dr. Bandel sought to avoid this waste by forming the tobacco particles into sheets held together by an adhesive, in this case, locust bean gum. The sheets would then be shredded in the same manner as natural leaves and used as filler in the production of cigarettes. It is important that the sheets simulate the natural leaf as much as possible in every way. Thus, they should approximate it in moisture, tensile strength and thickness, in order to provide the same qualities of handleability in the manufacture of cigarettes. The composition was to be such that no unpleasant odors, tastes or colors would be introduced into the cigarette. Max Samfield also sought such a process.

More specifically in May-July 1952, Dr. Bandel conducted a series of experiments in the pilot plant of AMF in Brooklyn, New York. The first of these, done on a laboratory scale, is known as the ferrotype run and was held May 1–6, 1952. This experiment consisted of taping ten ferrotype plates, each having a usable area of 96 square inches, to a stainless steel belt which was sprayed with water. Tobacco dust was then applied to the moistened surface which was next passed through a drier. The plate was then removed from the belt and the adhesive, a solution of 3% locust bean gum according to Dr. Bandel, was applied to the layer of tobacco. The plate was next refastened to the belt and the second layer of tobacco dust was applied, after which the entire composition was put through a drier. Upon completion of that step, the manufactured tobacco sheet was removed from the plate.[4] Dr. Ban-

del stated that this was the first time that he had made a tobacco sheet having for its adhesive locust bean gum.

There followed other experiments of which three were relied upon by AMF. These are known as T Runs 180 A and B (May 20–27, 1952), T Runs 183 and 184 (June 3–19, 1952) and T Runs 187, 188, 189 and 190 (June 26–July 11, 1952). These followed substantially the ferrotype procedure but were done on a larger scale in that the composition was prepared on the stainless steel belt rather than on the ferrotype plate.

In making its ruling the Board considered only Dr. Bandel's T Runs 180 A and B, because, said the Board, only as to those runs was the element of tensile strength proved.[5] With regard to those runs the Board held that all elements were proved with the exception of gum content, as to which the Board noted a critical absence of corroboration of Dr. Bandel's testimony, as required by the Patent Office.[6]

The Board required that AMF prove its case beyond a reasonable doubt rather than by a mere preponderance of the evidence, since the pertinent Dr. Bandel application was not filed until after the Samfield patent had been issued. Nor, by reason of its failure to comply with Rule 224 [7] of the Patent Office, which requires timely notice, was AMF permitted to rely on the first Dr. Bandel application which was filed before the Samfield patent had issued.

The issue is two-fold, first, whether or not Dr. Bandel achieved a reduction to practice of a composition of matter prior to a similar reduction by Max Samfield, et al., and if that issue be determined in favor of Dr. Bandel then, secondly, whether or not AMF as the assignee of Dr. Bandel is entitled to a patent encompassing the genus galactomannan or merely the species, locust bean gum.

4. Patent Office Record, hereinafter identified as Plaintiff's Exhibit 1 at pp. 11–12.

5. Opinion of the Board, p. 4.

6. Opinion of the Board, p. 6.

7. 35 U.S.C.Appendix I, § 1.224.

Before proceeding to a consideration of the evidence, the applicable burden of proof should be stated.

■■ No determination of the Board may be overturned unless it is established by evidence, "which in character and amount carries thorough conviction"[8] that the Board's finding is either "without substantial basis * * * or was wrong as a matter of law."[9] And this is because of the weight to be given the decision of the Patent Office on any issue decided by it.[10] In those areas where the Board has made no finding, AMF's burden of proof is also beyond a reasonable doubt because the pertinent application was not filed until after the Samfield patent had been issued. As stated in Smith v. Carter Carburetor Corporation, 3 Cir., 1946, 130 F.2d 555, at page 560:

> "And, while a preponderance of the evidence is sufficient to enable the junior party to overcome the senior party's *prima facie* case of priority, where the senior party has already received a patent, the evidence in support of the junior party's right to priority must be so strong as to remove all reasonable doubt thereof. 2 Walker, supra, § 199, pp. 916, 917."

As noted heretofore, the Board held that T Runs 180 A and B met all the requirements of the counts except gum content as to which, on the evidence presented, it found Dr. Bandel's testimony uncorroborated under the test of Thurston v. Wulff, 1947, 164 F.2d 612, 35 C.C.P.A. 794.

■ As to reduction to practice in an interference proceeding, that case requires that the inventor be corroborated. The corroboration may be other than by an independent witness, but the "proof or evidence should be independent of the testimony of the inventor and should not consist of self-serving documents prepared by him or under ·his direction, nor should it be based upon facts the truth of which depends upon information received from the inventor." Thurston v. Wulff, supra, 164 F.2d at page 617.

■ In this court Herbert J. Light, a research technician, who worked under Dr. Bandel and who prepared the adhesive and made the cigarettes, testified that T Runs 180 A and B contained respectively 3 to 5% and 7 to 10% locust bean gum adhesive "in the final sheet."[11] He based this testimony on work sheets which he had prepared.[12] Although Mr. Light appeared before the Board, his testimony in this matter was not elicited.

At the time of the trial Dr. Bandel had been disassociated from AMF for about nine months. His former subordinates who testified for AMF were still employed by it, but beyond that fact there was no indication of any economic interest on his or their parts in the outcome of this proceeding. Their demeanor otherwise inspired confidence in their testimony. Mr. Light's statements were reinforced by his own notes as heretofore indicated and were not based upon facts the truth of which depended upon information received from Dr. Bandel, whose testimony and notes were thus independently corroborated.

Hence I find Dr. Bandel corroborated by Mr. Light as to the gum content of T Runs 180 A and B, although for reasons hereinafter set forth, these runs fail to come within the counts.

Dr. Bandel testified that the tensile strength of the natural tobacco while not lending itself to accurate measurement is

8.  Morgan v. Daniels, 1893, 153 U.S. 120, 14 S.Ct. 772, 773, 38 L.Ed. 657.

9.  Minnesota Mining & Mfg. Co. v. Carborundum Co., 3 Cir., 1946, 155 F.2d 746, 749.

10.  Sinko Tool & Manufacturing Co. v. Automatic Devices Corporation, 2 Cir., 1946, 157 F.2d 974.

11.  Record, pp. 31–34.

12.  Plaintiff's Exhibits 1F, 1H, 1I, 1K, 8 and 9.

generally within the range of 100 to 500 grams per inch.[13] On the basis of measurements and physical examinations, he testified that the ferrotype microflake tobacco sheet, hereinafter called MTS, had a tensile strength of 150 to 200 grams per inch.[14] In this he is corroborated by Mr. Light.[15]

The tensile strength of the remaining runs, 183 and 184 and 187 through 190, is established by Mr. Light,[16] who testified that "I think the final test [of tensile strength] is the matter of how it handles in the processing equipment." This testimony has the force of logic. Further corroboration is found in the testimony of Mr. L. W. Kluytenaar,[17] supervisor of the pilot plant, based on three to four years experience, that the tensile strength of all four runs was "about the same" as that of the natural leaf tobacco.

As to thickness, Dr. Bandel testified that all four runs produced sheets within the tolerance of natural tobacco, .006 to .008 of an inch.[18] Again he was corroborated by Mr. Light[19] and Mr. Kluytenaar[20] who testified as to the handleability of the MTS.

■ The counts do not teach a precise tensile strength or thickness. They do demand that these properties in the MTS approximate the natural leaf. Dr. Bandel and Messrs. Light and Kluytenaar are all experienced tobacco men. Their testimony, even in the absence of tests and processing, is entitled to considerable weight. Coupled with these other factors the effect is even stronger. I am therefore constrained to find that the requirements of the counts as to tensile strength and thickness were met in all four runs.

The moisture content is established clearly both here and in the Patent Office as within 9 to 13% as taught. Mr. Light testified[21] that if the MTS were too dry they would break easily and if too moist would be gummy, and "would not fall and form into cigarettes properly." To insure proper moisture, he placed the MTS from all four runs in a room controlled as to humidity. He further testified that the MTS' handleability in the cigarette machine gave "a very positive indication of moisture."[22]

Mr. Kluytenaar's testimony[23] corroborated Mr. Light, as does Plaintiff's Exhibit 8, an excerpt from Mr. Light's notebook indicating that runs 183 and 184 had moisture contents of 11.4% and 12.5% respectively. The proof of moisture content accepted by the Board in the case of T Runs 180 A and B is substantially the same as that offered in support of the remaining runs, 187, 188, 189 and 190. Therefore the moisture content of all four runs satisfies the requirements of the counts.[24]

In its consideration of T Runs 180 A and B, the Board found that:

"the opinions of the test panel, made long before this contest arose, [are] adequate and the statements made in contemporaneous records as to the satisfactory results with locust bean gum are entitled to great

13. Plaintiff's Exhibit 1, p. 24.

14. Plaintiff's Exhibit 1, p. 23.

15. Plaintiff's Exhibit 1, p. 230.

16. Ibid.

17. Record, p. 75.

18. Plaintiff's Exhibit 1, pp. 22, 24.

19. Record, p. 41, Plaintiff's Exhibit 1, pp. 140, 176.

20. Record, p. 75, Plaintiff's Exhibit 1, p. 272.

21. Record, p. 35 ff.

22. Record, p. 38.

23. Record, p. 74 ff.

24. Plaintiff's Exhibit 1-A, pp. 41-45, which was before the Board shows the moisture content of T Runs 180 A and B as 15.4% and 15.85% respectively. Nevertheless the Board found this within the acceptable tolerance of 9-13% set forth in the counts. Cf. Board's Opinion, p 6.

weight in this regard." Board's Opinion, p. 7.

The suitability of the remaining runs is supported by virtually the same test panels consisting generally of the same smokers.[25] The Board said that "Dr. Bandel's tests involved comparison with a proven standard and this is considered sufficient." Board's Opinion, p. 7. Except for cigarette No. 29[26], all locust bean gum MTS cigarettes were compared with MTS having HCMC[27] for their adhesive. The latter was a preparation with which AMF was experimenting as early as 1949. At the trial it was stipulated that during 1951, L&M sent a number of hogsheads of tobacco to AMF for its use in making tobacco sheet material. This AMF did, using HCMC as the adhesive, and the sheets so made were returned to L&M where they were blended with L&M's own tobacco and made into cigarettes at a proportion of 5 to 10% of MTS, the balance natural leaf. More than 100,000 of these cigarettes were sent to AMF and an unspecified number were retained by L&M. In order to ascertain public acceptance AMF employed the National Family Opinion Poll, while L&M used the Arthur D. Little Company of Boston. The results of these polls are not before the court.

The MTS made with HCMC then must have been the standard to which the Board referred. But the acceptability of this standard is unknown. Indeed, one of the manufacturers, Philip Morris, objected to the cigarettes made with HCMC in 1952.[28] A comparison with such a standard was ineffective as a control. Accordingly, I must disagree with the Board's finding that T Runs 180A and B met the requirements of the counts for suitability for smoking, nor do I find that AMF has proved that this requirement was met in the ferrotype run or in T Runs 183 and 184 and 187 through 190.

The next consideration is that element teaching that the balance of the composition be essentially all dry-ground tobacco. Mr. Kluytenaar who prepared the tobacco dust testified conclusively that only dry-ground tobacco was used in these tests.[29] Dr. Bandel corroborated this, as did Mr. Light.[30] The facts here are really undisputed. Accordingly, the requirement of the counts in this respect is met.

Similarly, there is no real doubt that the products of the four test series offered by AMF constituted a composition of matter, as contemplated by the counts.

The gum content, however, does not permit of such a facile conclusion, complicated as it is by the presence in each of the runs except the ferrotype, of substances not disclosed in the claims of Dr. Bandel's application of July 1955.

Dr. Bandel testified that the ferrotype run contained about 10% locust bean gum as the adhesive.[31] He explained that, "We sprayed the adhesive [locust bean gum] on the belt until a certain weight was on the sheets and we could calculate from that the percentage of gum."

Mr. Light corroborated Dr. Bandel by testifying that the locust bean gum content in this run was between 5 and 10%.[32]

Documentary support is found in a Work Progress Report[33] which relates

---

25. Plaintiff's Exhibits 1, pp. 6, 171, 172, 1-A, 1-C and 1-D.

26. Cigarette No. 29 consisted of 93% rerolled Philip Morris cigarette tobacco and 7% locust bean gum MTS and was compared to cigarette No. 30 which was a rerolled Philip Morris cigarette.

27. HCMC stands for carboxymethyl cellulose.

28. Plaintiff's Exhibit 1-A, pp. 41–42.

29. Record, p. 75.

30. Plaintiff's Exhibit 1, pp. 21–23, Record, p. 40.

31. Plaintiff's Exhibit 1, p. 21.

32. Plaintiff's Exhibit 1, p. 138.

33. Plaintiff's Exhibit 1-A, p. 41–44.

that the base web was sprayed on, "to give approximately 10% adhesive as the finished sheet."

But in the case of every run except the ferrotype all adhesive mixtures contained non-tobacco additives not disclosed in the claims of Dr. Bandel's July 1955 application. Certain of these additives, such as glycerine, diethylene glycol and flavoring extracts, were commonly used by tobacco manufacturers in 1952 as humectants and buffers, designed to affect favorably the taste of the tobacco. As to these additives no objection is heard. Other additives, specifically glyoxal, glassine and cigarette paper fiber employed by Dr. Bandel were not in use in the tobacco industry in 1952.

Thus, all cigarettes except those made with ferrotype MTS, contained 6 to 13% glyoxal and with the exception of number 12, equal parts of locust bean gum and either glassine fiber or cigarette paper fiber. In determining the effect of the introduction of these substances, a matter not considered by the Board, attention must be given to the language of the counts in this case, i. e., "consisting essentially of."

█ The Patent Office Board of Appeals has defined certain terms of art, commonly employed in patent applications.[34] Thus, "comprising" and "comprising essentially" have been held not to preclude "the inclusion of unspecified ingredients even in major amounts." "Consisting of" is held to close, "the claim to the inclusion of materials other than those recited except for impurities ordinarily associated therewith." "Consisting of essentially," the words with which we are concerned, renders "the claim open only for the inclusion of unspecified ingredients which do not ma-

terially affect the basic and novel characteristics of the composition." Thus, if any of the undisclosed additives materially affect the basic and novel characteristics of the MTS made from all runs except the ferrotype, Dr. Bandel's composition is not within the teaching of the counts, at least as to those runs.

Tests established that glassine increased the tensile strength of the MTS fourfold.[35] Glyoxal increased the water resistancy of the sheet.[36] Cigarette paper fiber which also increased tensile strength was used as an economic filler.[37]

More crucial is Dr. Bandel's own testimony on cross-examination that glyoxal "cross-links the adhesive chains, the molecules in the adhesive chains," a process which he analogized to the vulcanization of rubber.[38] Dr. Smith, a witness for L&M, gave similar evidence when he testified that the union of glyoxal and locust bean gum produced acetal, a compound in which there remains few unaffected locust bean gum molecules.[39]

█ It is clear from this testimony that the locust bean gum was materially affected by these substances, especially by glyoxal which endowed it with a water resistance far beyond its norm. It is true that they are revealed in the examples given in the specifications of Dr. Bandel's July 1955 application. However, they do not appear in the claims thereof. While specifications may be read to interpret claims, they may not be read to enlarge them. General Electric Co. v. Wabash Appliance Corp., 1938, 304 U.S. 364, 58 S.Ct. 899, 82 L. Ed. 1402, Hercules Powder Co. v. Rohm & Haas Co., D.C.Del.1946, 66 F.Supp. 899. Since these substances were not disclosed in the claims of Dr. Bandel's application, all runs but the ferrotype are

34. Ex parte Davis, 80 U.S.P.Q. 448 (P.O. Bd. App.1948).

35. Record, pp. 67–69, 92, Plaintiff's Exhibit 1–F.

36. Record, p. 92.

37. Ibid.

38. Record, pp. 92 ff.

39. Record, pp. 194 ff.

held to be not within the counts and this is true even assuming that the initial adhesive contained locust bean gum in the percentages described by Dr. Bandel and Messrs. Light and Kluytenaar, because the counts as recited do not teach the composition, so that one skilled in the pertinent art would be able to re-create it. Field v. Knowles, 1950, 183 F.2d 593, 600,. 37 C.C.P.A. 1211. Thus if AMF is yet to prevail, it must do so on the basis of the ferrotype run alone, as to which the question of whether or not a reduction to practice was achieved in 1952 remains.

Plaintiff's Exhibits 1–A, 1–C and 1–D are Progress Reports submitted to AMF by Dr. Bandel and two of his associates. They are dated respectively May 28, 1952 (covering the period April 25, 1952 to May 25, 1952), July 7, 1952 (covering the period May 26, 1952 to June 25, 1952), and August 15, 1952 (covering the period June 26, 1952 to July 25, 1952).

The ferrotype run was made on May 1–6, 1952. The following excerpts from Plaintiff's Exhibit 1–A are noteworthy:

"I. Summary

\* \* \* \* \* \*

"B. Conclusions.

\* \* \* \* \* \*

"2. To date, no highly effective method for improving the smoking quality of 'MTS' has been discovered. Humectants and certain base web adhesives result in small has significant improvements in reducing the irritation of 'MTS' smoke (sic)

"C. Recommended Future Work.

"1. Continue to evaluate the various base web adhesives and additives to improve the smoking qualities of 'MTS'.

"2. Attempt to isolate the factors in the 'MTS' responsible for the

fact that its smoking qualities are inferior to the parent tobacco.

"D. Procedure and Results

\* \* \* \* \* \*

"4. Taste Improvement of 'MTS'

"Research has continued towards discovering methods of improving the flavor and reducing the irritation of 'MTS' chiefly to answer the objections of Philip Morris and generally, to widen the acceptance of 'MTS' products and keep ahead of competitive products.

"a. Effect of Base Web Composition on Taste of 'MTS'

"Several film forming water soluble gums were tested on a laboratory scale to determine their suitability as base web adhesives and to determine the effect of these gums on the taste of 'MTS'. The adhesive gums, Arabic, Karaya and Dextrin proved to be too brittle and did not form satisfactory sheets. Film forming gums such as NaCMC, Kelgin Locust Bean and Methocel produced satisfactory sheets. On the basis of preliminary smoking tests, resistance to water and low cost, Locust Bean Gum appeared to be a promising base web adhesive and pilot plant runs were scheduled.

"Smoking tests indicated that the addition of 100% glycerine based upon HCMC reduced irritation noticeably. The mechanical and tobacco loading characteristics of sheet prepared from a base web containing 100% glycerine based on HCMC were satisfactory.

\* \* \* \* \* \*

"*Taste Tests.*

"The 'MTS' sheets prepared on a laboratory scale as described in the section above on Base Web were made up into cigarettes and smoked against L&M 'MTS' Run 764 by a panel composed of D. Bandel, H.

Light, E. Ganz and J. Desmond. The comments are noted below:

"NaCMC: Very little irritation, much better taste than control. Ash 'softer', more like a regular cigarette.

"Kelgin: Made very good 'MTS' sheet, but low tensile strength. Much less irritating than control, quite mild. Much better taste.

"Methocel: Made good 'MTS' sheet. Rather sharp and irritating sensation. Bad taste, acrid odor.

"Locust Bean Gum: Made good 'MTS' sheet. Very mild smoke, smooth, no irritation. Good 'soft' ash like regular cigarette.

"Gum Karaya: Very poor sheet, crumbled badly. On shredding, broke down into fine dust. Cigarettes hard to draw because of excessive dust. Very mild smoke, a sweet, pleasant taste.

"It should be noted that these base webs did not contain glassine and glyoxal so that a direct comparison between them and regular 'MTS' is not too valid. In addition 764 appears to give an unusually irritating smoke, in comparison with some other 'MTS' runs. However it was felt that these gums produced an 'MTS' at least as good as the HCMC standard base web and probably less irritating. * * * "

Also significant are these excerpts from Plaintiff's Exhibit 1–C:

"I. Summary
*   *   *   *   *   *
"B. Conclusions
"1. Locust bean gum appears to be a satisfactory adhesive for use as the adhesive for 'MTS'. It has a considerable economic advantage over our present HCMC adhesive.
*   *   *   *   *   *
"C. Recommended Future Work
"1. Continue the fundamental investigations of the effect of 'MTS' process varriables (sic) and additives on the chemical constituents of tobacco smoke. The 'MTS' improve-

ment program has reached the stage where more fundamental information on the factors affecting quality must be obtained if our efforts are to be guided along the most promising directions. * * *

"2. Continue the evaluation of locust bean gum as a base web adhesive and develop optimum formulations for base webs containing this adhesive. The economic advantages of locust bean gum over our present HCMC base web adhesive make locust bean gum an attractive possibility."

The last report, Plaintiff's Exhibit 1–D, contains the following:

"I. Summary
*   *   *   *   *   *
"C. Recommended Future Work:
*   *   *   *   *   *
"2. Continue the evaluation of base web formulation, particularly locust bean gum as adhesive, and higher humectant concentration."

While the tenor of these quotations, concurred in, or prepared by Dr. Bandel is one of hopeful expectancy, these reports nowhere reflect a conviction that the sought-after composition had been attained. Indeed, the opposite is true. Thus in July 1952 the last of these tests were held. Two and one-half years later, Dr. Bandel filed his original application, since abandoned. During that time Samfield et al. of course had filed their application.

In Corona Cord Tire Co. v. Dovan Chemical Corp., 1928, 276 U.S. 358, at page 383, 48 S.Ct. 380, at page 387, 72 L.Ed. 610, the Court said:

"A process is reduced to practice when it is successfully performed * * * A composition of matter is reduced to practice when it is completely composed."

Further said the Court, 276 U.S. at page 384, 48 S.Ct. at page 388:

"It is a mistake to assume that reduction to use must *necessarily* be a commercial use." (Emphasis supplied.)

The connotation implied in "necessarily" is amplified in Harrison v. Caldwell, 1930, 39 F.2d 704, 17 C.C.P.A. 1024, in which the Court, while allowing that laboratory tests were sufficient in that case involving rubber vulcanization, stated that certain areas may exist where they would not be sufficient. The Court explained that although manufacturers faced with great expense in the exploitation of a given invention might apply additional and more stringent tests in order to determine the commercial expediency of wholesale manufacture, this standard was not thereby imposed on patent tribunals. Thus an argument bottomed on the possibility of difficulties in commercial manufacture, unforeseen in successful laboratory production, has been held of no force. St. John v. Schulze, 1931, 47 F.2d 798, 18 C.C.P.A. 1050.

But Judge Learned Hand has said in Sinko Tool & Mfg. Co. v. Automatic Devices Corp., 157 F.2d 974, at page 977:

" * * * a test under service conditions is necessary in those cases, and in those only, in which persons qualified in the art would require such a test before they were willing to manufacture and sell the invention, as it stands."

■ Thus the Supreme Court has said that reduction to practice requires in the case of a composition of matter that the matter be successfully composed, as heretofore noted. The success of the composition is in turn measured by the teaching of the counts. This does not mean a commercial manufacture past, present, or contemplated. It does require that the composition in the laboratory be so carried out as to assure its efficacy and utility beyond a reasonable doubt. Van Auken v. Cummings, 1931, 49 F.2d 490, 18 C.C.P.A. 1250.

The Court of Appeals for the District of Columbia has stated in Larsen v. Marzall, 1952, 90 U.S.App.D.C. 260, 195 F.2d 200 that the test of reduction to practice is first, whether the alleged reduction so clearly shows the efficacy of the process that practical men will, without more, risk commercialization, and, second, whether the reduction to practice is such that further expenditures of time and expense would be unjustified, in view of the small likelihood that they would substantially increase knowledge of the invention.

In the instant case the MTS produced and made into cigarettes in the ferrotype run, were then smoked on a very limited scale—four smokers each smoking but one cigarette.

Whether Dr. Bandel's alleged reduction meets any of the foregoing tests is doubtful. Since this is so, the case of Bowers v. Valley, 1945, 149 F.2d 284, 32 C.C.P.A. 1039, is in point. In that case the court also found the alleged reduction to practice doubtful. The shop notes recited, "This set-up *may have merit*." Considering this language, the court said, 149 F.2d at page 287:

"This would indicate that when the test was completed, the parties were not satisfied with the working of the ring, and that it *might* have merit as a slapper or scraper; but this entry must be looked upon at least as evidence of a doubtful attitude as to whether or not there was any merit in the device. Tests should be 'such as to establish utility beyond *probability* of failure.' " [40]

While diligence is not required between an actual reduction to practice and the filing of the application, nevertheless, because of the existing doubts the court looked to that period in an effort to determine whether the reduction had been achieved. Bowers had delayed for three years before he filed his application. The court reflected this delay among other considerations which led it to conclude that there had not been a reduction to practice.[41]

In the instant case 30 months elapsed between Dr. Bandel's alleged reduction

40. cf. Whitehead v. Diamond, 1938, 97 F. 2d 604, 25 C.C.P.A. 1357.

41. cf. Conner v. Joris, 1957, 241 F.2d 944, 44 C.C.P.A. 772.

to practice and the filing of his first application on November 12, 1954, and 38 months until the application of July 14, 1955. During that time there is no evidence of any activity on the MTS cigarette project.[42] Samfield, et al. had filed their application on May 28, 1954. Viewing these facts in the light of the Progress Reports, I cannot find that the ferrotype run was a reduction to practice.

In summary I find, first, that all four runs fail to satisfy the requirements of the counts as to suitability for smoking, save cigarette No. 29 of T Run 184, because, with that sole exception, all the cigarettes produced were test smoked against invalid standards. Secondly, I find that as to the T Runs 180 A and B, 183 and 184, (including cigarette No. 29) and 187 through 190, AMF has failed to come within the counts because of the introduction of substances undisclosed in the claims of Dr. Bandel's July 1955 application which materially affected the composition of matter as heretofore set forth. I find that all four runs meet all the remaining requirements of the counts as taught.

I conclude that AMF has failed to prove that Dr. Bandel achieved a reduction to practice of a composition of matter prior to a similar reduction for which application for a patent was filed by Max Samfield, et al. on May 28, 1954, upon which United States Patent No. 2,708,175 was issued May 10, 1955. Hence the complaint herein must be dismissed and judgment in favor of the defendant entered accordingly.

In view of this decision the second issue in this case, AMF's entitlement to a patent for the genus galactomannan, need not be determined.

The foregoing shall constitute findings of fact and conclusions of law in fulfillment of Rule 52(a) Federal Rules of Civil Procedure, 28 U.S.C.A. An order should be submitted.

42. Plaintiff's Exhibit 1, p. 116, RXQ 603.