52 CCPA

**Application of David BANDEL.**
**Patent Appeal No. 7402.**

United States Court of Customs
and Patent Appeals.
July 19, 1965.
Rehearing Denied Oct. 12, 1965.

John T. Kelton, New York City (William H. Vogt, III, William A. Drucker, New York City, of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for the Commissioner.

Before RICH, Acting Chief Judge, and MARTIN, SMITH and ALMOND, Judges.

MARTIN, Judge.

David Bandel appeals from the action of the Board of Appeals affirming the examiner's rejection of claims 24 to 36 and 38 to 40, all the remaining claims, of his application serial No. 521,984, filed July 14, 1955, for Tobacco Sheet Material and Method of Forming, a continuation-in-part of serial No. 468,270, filed Nov. 12, 1954.

The application relates to the conversion of tobacco particles into compositions in a form, such as sheets, suitable for use in manufacturing cigarettes, cigars, pipe tobacco, chewing tobacco and the like. It states that film-forming agents in such compositions should not introduce any offensive odor, taste or color into the tobacco or tobacco smoke or alter substantially the natural properties of the tobacco as a smoking product. Suitable compositions are described as comprising a mixture of particles of finely-divided, dry-ground tobacco, adhered together by a plant gum adhesive such as the galactomannan plant gum, locust bean gum, and teaches that other substances may be added. Thus, it is said that glycerin may serve as a humectant or plasticizer, while glyoxal seems to improve water resistance and paper-pulp mechanically reinforces the film forming agent.

Claims 24, 29, 30, 33 and 38 are representative:

24. A composition of matter comprising in combination a major proportion by weight of said composition of finely divided dry ground tobacco which will pass through a 20 mesh screen and be mostly retained by a 325 mesh screen, moisture between 8% and 24% by weight of said composition, and a minor proportion of galactomannan plant gum, between 0.5% and 33% by weight of said composition, said gum serving as an adhesive to hold together said tobacco.

29. A composition according to Claim 24 which includes glyoxal.

30. A composition of matter comprising in combination particles of finely divided dry ground tobacco adhered together by a galactomannan plant gum adhesive.

33. A smoking article made at least in part from a composition of matter which comprises dry ground tobacco particles held together by galactomannan adhesive.

38. The method of making a tobacco product which comprises mixing together galactomannan plant gum adhesive and finely divided dry ground tobacco in the presence of moisture to form a viscous mass and shaping said viscous mass into a tobacco product by extrusion.

The present application has been involved in two interferences, both of which terminated adversely to appellant. The first, No. 87,744, involved two counts copied from Samfield et al. Patent No. 2,708,175 issued May 10, 1955 on an application filed May 28, 1954. Count 1 reads:

1. A composition of matter suitable for smoking consisting by weight of a minor proportion, about 1% to 20%, of a plant gum consisting essentially of galactomannan, approximately 9% to 13% of moisture, and the balance essentially all dry-ground tobacco with the individual finely-divided fragments thereof cohered together so as to have, when formed in sheets of about the thickness of natural leaf tobacco, a tensile strength approximately equal to the tensile strength of such leaf tobacco.

Count 2 differs in reciting the specific gum "locust bean gum" instead of "a plant gum consisting essentially of galactomannan."

The other interference, No. 89,623, was on three counts copied verbatim from a reissue of the above patent, Reissue No. 24,424, issued February 4, 1958. Those counts differ from the counts of the previous interference principally in the inclusion of a humectant. Count 1 of interference No. 89,623 is representative:

A composition of matter suitable for smoking consisting by weight of a minor proportion, about 1% to 20%, of a plant gum consisting essentially of galactomannan, approximately 9% to 13% of water, a humectant in an amount not exceeding about 12%, and the balance essentially all dry-ground tobacco with the individual finely-divided fragments thereof cohered together so as to have, when formed in sheets of about the thickness of natural leaf tobacco, a tensile strength approximately equal to the tensile strength of such leaf tobacco.

The examiner relied on the Samfield et al. patents in rejecting the claims and also on the following:

| | | |
|---|---|---|
| Frankenburg et al. | 2,592,553 | Apr. 15, 1952 |
| Wells et al. | 2,433,877 | Jan. 6, 1948 |

E. Anderson—Endosperm Mucilages of Legumes, Journal of Industrial and Engineering Chemistry, December 1949, Volume 41, No. 12, pages 2887–2890.

| | | |
|---|---|---|
| Jurgensen | 2,734,509 | Feb. 14, 1956 |
| (filed December 20, 1951) | | |

Condensed Chemical Dictionary, Reinhold Pub. Corp. (1950), p. 323.

———————◆———————

The Samfield et al. patents disclose a reconstituted smoking tobacco composition which consists essentially of a major proportion of fragmented tobacco and a minor proportion of galactomannan plant gum[1] plus added moisture in the form of water alone or water and a suitable humectant such as glycerin. That composition is disclosed as in sheet form and of a thickness and strength approximating that of natural tobacco leaf and as suitable for blending with leaf tobacco in the manufacture of cigarettes, cigars and other forms of smoking tobacco.

Frankenburg et al. discloses a reconstituted tobacco comprising dry-ground tobacco and a binder therefor.

Wells et al. discloses reconstituted tobacco compositions and methods of making them. As one of the steps of the method, it discloses extrusion of filaments of the composition through nozzles. Also described is the use of fibers to reinforce sheet material made from finely ground tobacco particles held together in a matrix.

The Anderson reference discloses that locust bean gum and Kentucky coffee gum both contain galactomannan gums.

The Jurgensen patent describes reconstituted tobacco sheet material comprising ground tobacco, carboxymethyl cellulose, glyoxal and glassine pulp.

The examiner stated in his answer that claims 24, 25, 30, 32 through 36 and 39 were rejected on either Samfield et al. patent alone. Also he stated that claims 24 through 29, 31, 32, 38 and 40 were rejected on Samfield et al. taken with certain of the other references, pointing out features that the latter references were regarded as suggesting. An affida-

1. The patents name "guar gum" and "locust bean gum" as suitable gums consisting principally of galactomannan.

vit under Rule 131 filed by appellant was acknowledged by the examiner but was deemed not to overcome the Samfield et al. patents. The examiner did not discuss the substance of the affidavit but based his conclusion concerning it on his view of the effect of the two interferences with Samfield et al. which terminated adversely to appellant. In that connection he cited In re Derleth, 118 F. 2d 566, 28 CCPA 973, stating:

In In re Derleth, supra, it was held that when, in the case where an applicant was in interference with a patentee and the applicant was notified that claims not forming the counts of the interference would be held subject to rejection as unpatentable over the issue in the event of an award of priority adverse to the applicant and the applicant has not been shown to object to such disposal of the said claims not forming the counts of the interference, the patentee had a right to rely upon this disposition of the matter and was not called upon, in order to protect his rights to copy said noninvolved claims of the applicant.

The examiner pointed out that it was stated in the letter notifying appellant of the first interference with Samfield et al. that claims 2, 4, 5, 6, 7, 8, 9, 13 and 17 of the application would be held subject to rejection as unpatentable over the issue in the event of an award of priority adverse to appellant. He also quoted from Derleth as follows (118 F.2d at 569, 28 CCPA at 977):

It seems to us that here is a clear case of estoppel *in pais* against appellant. Upon the record before us we must assume that he did not object to the holding that claims such as are here involved would be held subject to the outcome of the interference. The patentee Askenasy therefore had a right to rely upon this disposition of the matter and was not called upon, in order to protect his rights, to copy the rejected claims of appellant's application. The patentee may well have been satisfied with the claims in his patent, for he was assured that if he won the interference appellant could not secure broader claims dominating the claims of his patent.

The answer further states that "it is the position of the Examiner that in the case at bar the facts warrant a holding of estoppel, just as was done in the Derleth case." In support of that conclusion, the examiner stated that appellant had ample opportunity to voice objections to the statement regarding the other claims in the application, either directly, in the motion period or in the period when the reissue application was open to him as a result of notice given him by the Commissioner upon the filing of that reissue application. It was also the view of the examiner that appellant could, through the provisions of section 1101.02 B [2] of the Manual of Patent Examining

2. 1101.02 B of M.P.E.P. 2nd Ed., reads in part:

B. In some cases, the disclosure in the application, although for the same invention in fact as the patent claim, is somwhat broader than the claim of the patent. Under such circumstances, in initially declaring the interference the applicant should be required to make the exact patent claim and the interterference should be declared on that claim. However, if the applicant presents and prosecutes a motion to substitute a broader count and, in connection with such a motion, makes a satisfactory showing, as by demonstrating that his best evidence lies outside the exact limit of the patent claim, the applicant may be permitted to substitute a count wherein language based upon his slightly broader disclosure replaces the corresponding limitation in the patent claim. In redeclaring the interference, the application claim should be used as the count of the interference and it should be indicated that the claim in the patent corresponds substantially to the interference count.

Procedure (M.P.E.P.), have taken action to substitute in the interference counts which were broader than the Samfield et al. patent claims and thereby obtain the benefit of any priority evidence he might have relating to such broader subject matter.

The board regarded the examiner as having rejected the claims for two separate reasons. It stated:

> As we view the Examiner's Answer, he has considered the appealed claims as unpatentable for two reasons: first, the affidavit under Rule 131 is insufficient to overcome the Samfield et al. patents, and these patents therefore stand as proper references, and the claims on appeal are not patentable over the references relied on as set forth * * * [in] his answer; second, the Examiner has taken the position that appellant is estopped from now urging the allowability to him of claims that are broader than those involved in the above noted interferences, by his failure to present such broader claims during the pendency of those interferences * * *.

With reference to the first of those reasons, the board noted that Rule 131 is limited to overcoming a patent "which substantially shows and describes but does not claim" the rejected invention. It then stated:

> Comparing claim 24 of this application with claim 1 of Samfield et al. * * * [2,708,175] we find that claim 24 differs therefrom by omitting the statement that the composition is "suitable for smoking," it recites a composition "comprising" certain materials instead of "consisting of" those materials, the ranges of moisture content and galactomannan are wider in claim 24, and the range of sizes of the tobacco is recited, whereas the patent claim omits any size limitation. The same materials are recited in both present claim 24 and the patent claim, and while the word "comprising" indicates that the composition *may* have other ingredients therein, the same materials are spelled out in both claims. The use of the word "comprising" instead of "consisting of" and the variation in the ranges and sizes of the materials used, as recited in these claims, merely constitute differences in scope between the claim of this application and the claim 1 of the patent and hence the patent and the application are claiming the same invention. Since the patent and the application are claiming the same invention, although the claims differ in scope, we agree with the Examiner that Rule 131, Rules of Practice, is not the proper remedy to overcome the Samfield et al. patents, and the Samfield et al. patents are proper references for everything disclosed therein, since these patents were the winning parties in the above noted interferences with appellant. The question of patentability between parties claiming the same subject matter can be determined only by interferences.

> We have carefully considered the rejection of claims 24 through 36, and 38 through 40 on the references as set forth * * * [in] the answer and we agree with the Examiner's rejections as there set forth, and for the reasons there stated. * * *

Specifically with respect to the question of "estoppel" arising out of the interference, the board stated that admittedly there are some situations in which a losing party to an interference may be entitled to broader claims than the winning party but held the present case not to constitute such a situation. It pointed to section 1101.02 B, M.P.E.P. as available where the applicant in interference can make a satisfactory showing as by demonstrating that his best evidence lies outside the exact limit of the patent claim. It considered the decision of the District Court in the first interference, American Machine & Foundry Company v. Liggett & Myers Tobacco Co., 172

F.Supp. 12 (D.N.J.1959), aff'd. 272 F.2d 451 (3rd Cir. 1959), and stated:

> * * * In that decision, the court held that in all runs or procedures except the one designated as "the ferrotype run," all adhesive mixtures contained nontobacco additives not disclosed in the canceled claims of the present application which were then before the court as counts of interference No. 87,744. See page 138, column 1 of 121 USPQ * *. The counts being considered by the court defined a composition "consisting of" certain materials, but since all of the runs except the ferrotype run included other materials which, according to the testimony, materially affected the locust bean gum, an element of the claimed composition, the court held that those other runs were not within the counts which were limited to the specific materials named. It is therefore apparent that appellant had proof available to support claims such as those now on appeal which are not limited to the specific materials of the counts of the previous interferences, since the claims on appeal recite a composition, or method of making a composition "comprising" the named materials and hence not specifically limited to those materials. Therefore the broader claims now on appeal appear to be susceptible of proof by evidence outside the limit of the patent claims involved in the interference, and therefore appellant should have availed himself of the procedure as set forth in the section of the Manual above referred to, whereby the question of who was entitled to the broader claims such as now presented could have been determined during the previous interferences.

The board agreed with the examiner's application of the Derleth case here and affirmed the rejection of claims 24, 25, 30 and 32 to 36 on the ground of estoppel stating:

> We consider claims 24, 25, 30 and 32 through 36 as being drawn to the same invention as were the counts in interferences 87,744 and 89,623, were fully supported by the disclosures in the Samfield et al. applications, and differ from the counts by being broader in scope only, and the patentability to appellant of the broader claims should have been determined in the previous interference.

The board did not affirm the rejection of claims 26 to 29, 31 and 38 to 40 on that basis, however. It held that claims 26 to 29 and 31 include specific materials not disclosed in Samfield et al. It further noted that claims 38, 39 and 40 are drawn to a method and stated that they "could not have been included in the previous interferences because Samfield et al. did not include any claims to the method of making the product, and hence the method did not find support in Samfield et al."

Appellant argues in his brief that "there is no rejection in this case on the ground of estoppel," apparently basing that argument on the contention that estoppel was discussed in the final rejection only in considering the case of the Samfield et al. patents as proper references. However, he states that the board's decision "rests on two principal grounds," describing the second as being "that appellant is estopped from urging allowability to him of the rejected claims by reason of his failure to present such claims during the pendency of the two interferences." Also, appellant specifically acknowledges a rejection on estoppel in the reasons of appeal numbered 12 and 13, the former charging that the board "erred in affirming the decision of the Examiner that applicant is estopped from urging the allowability to him of claims that are broader than the counts of the interferences in which this application was involved."

We think it clear from the detailed discussion above of the examiner's answer and the board's decision that both relied on an "estoppel" corresponding to that found by this court in the Derleth case. Appellant could not have been unaware of such position and apparently felt he had ample opportunity to respond to it since the record does not show that he took action to file a reply brief or obtain reconsideration by the board. Before us, appellant has fully briefed the rejection on that ground.

Determination of the merits of that rejection requires consideration of the differences between claims 24, 25, 30, and 32 through 36, involved herein, and the interference counts, particularly those of No. 87,744, the interference with the original Samfield et al. patent. Count 1 of that interference set out hereinabove, calls for a composition "consisting" of a plant gum consisting essentially of galactomannan, moisture, and "the balance essentially all" dry-ground tobacco. Count 2 defines the composition as "consisting" of locust bean gum, moisture and "the balance essentially all" dry-ground tobacco. The District Court held that, because of the expressions using "consisting" and "essentially" as quoted, were not open to the inclusion of other additives which materially affect the characteristics of the composition. The court found that glyoxal and glassine paper fiber, included in certain runs relied on by appellant for reduction to practice prior to the Samfield et al. filing date did affect the characteristics of the product so as to exclude those runs from the counts.

Appealed claims 24, 30 and 32 through 36 call for a composition "comprising" ground tobacco and galactomannan plant gum or a smoking article made from such a composition. Claim 25 calls for a composition according to claim 24 in which the plant gum comprises locust bean gum,

a particular gum named in the Samfield et al. patents as well as in the present application. Appellant, as well as the examiner and board, have treated those claims as generic, dominating the interference counts awarded to Samfield et al. as well as other appealed claims which include additional ingredients that the District Court found to affect the characteristics of the composition.

The situation here is closely analogous to that in the Derleth case. As in Derleth, appellant here was informed in the letter declaring Interference No. 87,744 that certain claims in his application, including an article claim which is clearly *broader* than the counts in the use of the term "comprising" [3] would be held subject to rejection as unpatentable over the issue in the event of an award of priority adverse to him. Also appellant took no action during the pendency of the interference to make known any disagreement with that holding. In particular, appellant did not take action under the procedure of M.P.E.P., Section 1101.02 B, to place a claim to broader subject matter in issue by demonstrating that his best evidence lies outside the terms of the Samfield et al. patent claims constituting the counts.

Appellant urges that procedure was not available because the difference between the broader claims he now seeks and the interference issue is not merely a difference in scope but was held by the District Court to be a patentable distinction. That latter contention is clearly erroneous. The District Court merely ruled that compositions of appellant which included an additive excluded from the interference counts through their use of "consisting" and "essentially" did not fall within the terms of those counts. The court made no ruling that a patentable difference is involved. The composition claims here define a composition or mixture made up of a plurality of com-

---

3. The claim in question reads:

8. A self supporting continuous tobacco sheet material comprising a substan- tially water insoluble locust bean gum film, forming a matrix for finely divided tobacco particles mingled therewith.

ponent materials.[4] Neither they nor the counts of the interference define the subject matter as involving a chemical reaction between the component materials. Thus the difference that results from the use of the term "comprising" in the appealed composition claims and the terms "consisting" and "essentially" in the counts is merely a matter of scope in a mechanical mixture and not a matter of chemical genus and species relationship.

For the same reasons as in the Derleth case, we think the patentees Samfield et al., who won the interference, were not called upon to introduce the broader subject matter by reissue to protect the rights they might have therein. Although the present proceeding is what is termed "ex parte" with Samfield et al. having no right to be heard, obviously it is actually the direct outgrowth of the interferences and the outcome as to the claims to broader subject matter affects the position of Samfield et al. Allowance of those claims would render the lengthy interference proceedings ineffective to determine the basic rights of the parties. Consistent with our decision in the Derleth case, we hold appellant is barred from obtaining claims 24, 25, 30 and 32 through 36 by his failure to take the opportunity available to him to prove priority as to them in the interferences.

The decisions relied on by appellant are clearly distinguishable from the present case on the facts. Thus, Ex parte Des Rosiers, 17 USPQ 272 (Bd.App. 1933) was clearly distinguished in Derleth where this court pointed out that it did not appear in the former case that there was a holding during the interference that claims dominating the counts would be held subject to the outcome of the interference.

In the case of In re Long, 83 F.2d 458, 23 CCPA 1078, dominating claims were allowed to the losing party in an interference on the basis of a situation entire-ly different from that here. There the record showed that Long's claims to the broad subject matter involved in the appeal stood allowed to him from the first action in the appealed application and that all parties to the three party interference recognized that both of Long's opponents had, either expressly or by their conduct, "disclaimed inventorship and waived any rights to any claim of inventorship in said broad subject-matter."

Another decision cited by appellant is In re Henderson, 50 App.D.C. 191, 269 F. 707 (D.C. Cir. 1921) which he attempts to distinguish. There an applicant who lost an interference with a patentee sought claims dominating the interference counts. The court noted that Henderson did not present the broader claims until after the time within which his opponent could have sought broader claims by reissue and held as a result that he was barred from obtaining them in subsequent ex parte proceedings. Appellant urges that the present case differs from the Henderson situation because the Samfield et al. disclosure would not have supported the present claims and because Samfield et al. knew from inspection of appellant's case that appellant disclosed and claimed a broader invention. As to the first contention, we have already concluded that Samfield et al. has support for the subject matter of claims 24, 25, 30 and 32 through 36. With respect to the second contention, the solicitor points out in the brief for the Commissioner:

Of the original claims, only claims 1 through 13 and 20 are product claims. Of these only claims 1, 4 through 7, and 20 are drawn generically to "galactomannan" gum rather than to species such as "locust bean gum". All of these "galactomannan" claims recite the term "consisting" and/or "consisting essentially of." Original claims 3 and 8 through 13 are drawn to the

---

4. Appellant states in his brief:

A further issue is whether an applicant who has proved prior reduction to practice of a number of species of a *mechanical mixture* is entitled to claims to those

species and to the genus, despite his having lost an interference with a patent involving a different patentably distinct species. * * * [Emphasis ours.]

species "locust bean gum." None of these original product claims (including claims 1 and 3 corresponding to the counts of the first interference) is as broad as the appealed "galactomannan" and "comprising" claims 24, 30, and 32 through 36 presented for the first time after the first interference was terminated in the Patent Office and after it was too late for the patentees to obtain broadened reissue claims. * * *

Thus appellant at the time of the interference, was not seeking any product claims as broad as claims 24, 25, 30 and 32 through 36 as to both the terms "comprising" and "galactomannan." Therefore, the Henderson case gives additional support to the rejection of those claims.

For the foregoing reasons, we are satisfied that the board correctly held claims 24, 25, 30 and 32 through 36 to be unpatentable to appellant on the basis of his failure to present them for adjudication in the interference.

In view of our conclusion that the rejection of claims 24, 25, 30 and 32 through 36 must be affirmed on the basis of the estoppel rejection, the other rejection as unpatentable over one or both Samfield et al. patents, either alone or in view of second references will be considered only with respect to remaining claims 26 through 29, 31 and 38 through 40. Both the examiner and the board considered to be inapplicable an affidavit under Rule 131 filed by appellant in an effort to antedate the Samfield et al. patents, the board stating that the "patent and the application are claiming the same invention, although the claims differ in scope." The board further stated:

* * * The Samfield et al. patents *are proper references for everything disclosed therein,* since these patents were the winning parties in the above noted interferences with appellant. * * * [Emphasis ours.]

It was also stated by the board:

* * * Appellant has not pointed out wherein the appealed claims are not readable on the subject matter described by the Samfield et al. patents by themselves or taken with the secondary references, substantially his whole argument in his brief and reply brief being directed to the question as to whether broad claims should have been included in the previous interferences.

The rejection utilizing Samfield et al. as references thus is not based on reliance on the claims as counts which formed the issue of the interference or on such disclosure as corresponds to the counts. Instead, it clearly is a rejection on prior art with those patents relied on as proper references (prior art) for "everything disclosed therein."

There are decisions, of which In re Boileau, 163 F.2d 562, 35 CCPA 727, and In re Gregg, 244 F.2d 316, 44 CCPA 904, are exemplary, which in effect treat the disclosure of a winning party involved in interference as an applicant as constituting prior art against the losing party, subject to combination with other prior art to reject claims in the losing party's application. We also note that M.P.E.P. 1109.02B states:

Except as noted in the next paragraph (judgment based solely on ancillary matters), any remaining claims in each defeated party's case should be reviewed in connection with the winning party's disclosure. Any claim in a losing party's case not patentable over the winning party's disclosure, either by itself or in conjunction with art, should be rejected. * * * However, a losing applicant may avoid a rejection based on *unclaimed* disclosure of a winning *patentee.* * * *

Samfield et al. having been involved in the interferences as patentees, it is the last sentence quoted above that is pertinent here. As the board recognized in reversing what it termed the estoppel rejection of the claims now under consideration, claims 26 through 29 and 31 include specific materials not disclosed by Samfield et al. and claims 38 through 40 are drawn to a process whereas the Samfield et al. patents do not include

any process claims. The board further recognized that those claims could not have been included in the interference. Thus appellant has not had the opportunity to prove priority as to everything disclosed in the patents but only to such subject matter as is claimed therein or might have been substituted under the procedure of M.P.E.P. Section 1101.02 B, discussed hereinabove.

■■ The situation here thus differs from that where, as in the Boileau and Gregg cases, supra, the interference was between applications and both parties had the opportunity to put any common patentable subject matter in issue. Certainly a party losing an interference to a patentee cannot properly be denied a chance to overcome the disclosure of the patentee as to subject matter which does not correspond to the issue of the interference or as to which he is not subject to an estoppel arising from the interference. The examiner and the board, in holding the Rule 131 affidavit inapplicable here, have refused to consider whether the affidavit does in fact overcome the Samfield et al. disclosures as to subject matter which the interferences did not preclude appellant from claiming. That was clearly error. We are therefore obliged to reverse the rejection of claims 26 through 29, 31 and 38 through 40 and remand the case for consideration of the effect of the affidavit under Rule 131 in conformity with our views as expressed herein.

The decision of the Board of Appeals is affirmed as to claims 24, 25, 30 and 32 through 36 and is reversed and the case remanded as to claims 26 through 29, 31 and 38 through 40.

Modified and remanded.

ALMOND, J., concurs in the result.

SMITH, Judge (dissenting in part).

The majority holds that estoppel exists against appellant as to claims 24, 25, 30 and 32 through 36. I cannot agree, for a number of reasons.

First, it is not at all clear from the majority opinion precisely *what it is* that appellant is thought to be estopped from doing with respect to those claims. The majority opinion implies, and the board specifically states, that "appellant is estopped from *now urging allowability* to him of claims that are broader than those involved in the above noted interferences." (Emphasis added.) This, of course, is simply not so. There is nothing in Title 35 of the United States Code which could be interpreted to deny an applicant the right to *present* and *argue for the allowability of* any claims he might desire. Thus, the only possible *fact* which appellant could be estopped from asserting (if an estoppel in fact exists) is that the date on which he made his invention is prior to the effective date of the Samfield references. In other words, he might be estopped to deny that the Samfield patents are *prior art* as against his claimed invention.

Second, and more importantly, I am unable in this case to find the elements of an estoppel in pais. Ballentine's Law Dictionary (2d ed. 1948) says this of estoppel in pais:

A term properly applicable only to a class of legal estoppels which are not strictly estoppels of record or by deed. Such estoppels were rare and enforced some technical rule of law against the truth, and also against the justice and equity of the particular case. The terms estoppel in pais and equitable estoppel are now generally used interchangeably as applicable to all estoppels which are not those by record or by deed. 19 Am.Jur. 633.

The same work defines "equitable estoppel" as

An estoppel whereby a person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon. 19 Am.Jur. 634.

Along the same lines, Black's Law Dictionary (3d ed. 1933) says:

> * * * An "estoppel in pais" arises whenever one, by his conduct, affirmative or negative, intentionally or through culpable negligence induces another to believe and have confidence in certain material facts, and the latter, having the right to do so relies and acts thereon, and is, as a reasonable and inevitable consequence, misled to his injury. * * * The term "estoppel in pais" includes estoppel by conduct, laches, negligence, and all other estoppels not arising from record, deed, or written contract; which forms of estoppel are also generally called "equitable estoppel," not because they are recognized as peculiar to equitable tribunals, but because arising upon facts rendering their application in the protection of rights equitable and just, which doctrine is recognized in courts of common law as well as in courts of equity. * * *

And, under "equitable estoppel":

> * * * "Equitable estoppel" is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed either of property, of contract, or of remedy, as against another person who has in good faith relied upon such conduct and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, contract, or remedy. * *

When viewed dispassionately, in the cold light of established legal doctrine, it is at once apparent that the facts of the instant case do not make out an estoppel in pais. The element most conspicuously absent is detrimental reliance on the part of the party to whom the representation was made or toward whom the conduct was directed. The opposing "party" in *this* case is, of course, the Patent Office, and it is difficult to see how that agency has been induced by any representations or conduct of appellant to assume a detrimental position in reliance thereon. Indeed, it is doubtful that any of the acts of appellant could be said to have been a "representation," although it is *arguable* that his failure to move to have the broader claims made an issue of the interference could be considered as evidence of an intent to abandon his hope of securing patent protection for them. But even this is sheer speculation.

The only party who could *possibly* be said to have a right to assert an estoppel against appellant is Samfield, as opposing party in the previous interferences. Thus, if the instant case were an inter partes matter, involving a priority contest between appellant and Samfield, perhaps Samfield might have some tenable basis for asserting an estoppel. But this begins to sound like an estoppel in the res judicata sense, wherein the parties are precluded from relitigating matters that *were* or *could have* been decided in an earlier contest between them. And indeed, the case from which much of the so-called doctrine of *estoppel in pais* seems to spring, Blackford v. Wilder, 28 App.D.C. 535 (1907), rests its decision squarely on the basis of *res judicata.* As the court there stated:

> To sum up: The parties are the same. The applications are the same, and disclose the invention of each issue. The constructions relied on, respectively, as evidencing conception and reduction to practice of the invention of both issues are the same. The fundamental facts of both cases are the same. Applying the well-settled principle of *estoppel by judgment,* before stated, it follows inevitably that the final decision in the first interference is conclusive, unless it can be made to appear that the question upon which the determination of the second case rests is one that *neither was nor could have been presented and determined in the first case.* [Emphasis added.]

Here, the parties are not the same, and it has not been determined that "the

question upon which the determination of" the present case rests could have been presented in the previous interferences between appellant and Samfield.

Unfortunately, the long line of cases in this court which have expounded the doctrine of estoppel in pais have all too frequently placed heavy reliance on Blackford v. Wilder without seeming to recognize the limitations of that decision. Thus, in In re Rhodes, 80 F.2d 525, 23 CCPA 816, we find the court relying upon Blackford v. Wilder in a situation where, as in the instant case, the parties (appellant and Patent Office) were *not* the same as those involved in the previous interference proceeding. The decisions of this court seem to have subtly shifted from the true rule of res judicata annunciated in Blackford v. Wilder, to a sort of hybrid "estoppel" which meets neither the requisites of res judicata nor estoppel in pais. In In re Sommer, 56 F.2d 893, 19 CCPA 1030, one of the first cases to rely upon Blackford v. Wilder, the court indicated approval of the doctrine of *res judicata,* without mentioning, however, that the elements of res judicata were not fully met due to the fact that the same parties were not involved. However, in an even earlier case, In re Austin, 40 F.2d 756, 17 CCPA 1202, the court was already talking in terms of "estoppel" with little regard to whether the *elements* of an estoppel had actually been made out. Thus:

> * * * if a party to an interference fails to comply with the rules of the Patent Office relative to the presentation of * * * claims [counts], it is thereafter estopped from presenting them as a basis for another interference between the same parties. * * *

One could hardly deny that there is a long line of cases which have consistently used the term "estoppel" in connection with an applicant's right to present, in an ex parte context, claims which were not put in issue in a previous interference between the applicant and another. I have endeavored to show that in such situations there exists no basis for a true estoppel in pais, nor is there ground for application of the doctrine of res judicata. What, then, do these cases really hold? As far as I have been able to determine, they annunciate a sound judicial policy: Where claims *clearly* could have been put in issue in a previously adjudicated interference proceeding, an applicant should not normally be allowed such claims in a subsequent ex parte proceeding. The reported decisions can be rationalized on no other basis. There is no estoppel in pais, no res judicata. There is simply the judicial determination that it is in the best interests of fairness to the opposing party in the interference, of conservation of judicial and administrative time and energy, and of protection of the public from the obvious evils of interfering patent claims, that the applicant, as to such claims, should not have a second day in court. As Judge Bland said in his concurring opinion in the Rhodes case, supra:

> I concur in the decision of the majority on account of the use of the word "clearly" in the phrase "and presumably knew that the involved invention was clearly disclosed therein."

> \* \* \* \* \* \*

> The so-called doctrine of estoppel is a harsh one and not favored by the courts. Nevertheless, the Patent Office and the courts have found it a wholesome one to apply where the party to which the estoppel is applied neglected or refused to contest priority on a part of the inventive subject-matter in his adversary's application.

> \* \* \* \* \* \*

> * * * One should not be held to be in an inequitable position who has failed to present a claim of priority in that which would ordinarily be overlooked by a diligent, capable patent interference litigant.

So the ultimate question in this case, as I see it, is *could* the issue of priority with respect to appellant's present claims 24, 25, 30 and 32–36 *clearly* have been determined in the previous interfer-

ences? It is my view that it is not at all clear that such issue could have been decided in the interference proceedings.

The decision of the majority appears to rest on the ground that appealed claims 24, 25, 30 and 32–36 are directed to the *same invention* as the counts of the Samfield interferences, the differences being merely of scope. I most emphatically disagree. For one thing, if the claims and the counts are directed to the *same invention*, then why were not appellant's proofs regarding compositions which included additional additives accepted as showing reduction to practice of the counts, in the district court in the first interference? Consider what the district court said in this regard (172 F.Supp. at 19):

> \* \* \* if any of the undisclosed additives materially affect the basic and novel characteristics of the MTS made from all runs except the ferrotype, Dr. Bandel's composition is not within the teaching of the counts, at least as to those runs.

> Tests established that glassine increased the tensile strength of the MTS fourfold. Glyoxal increased the water resistance of the sheet. Cigarette paper fiber which also increased tensile strength was used as an economic filler.

> More crucial is Dr. Bandel's own testimony on cross-examination that glyoxal "cross-links the adhesive chains, the molecules in the adhesive chains," a process which he analogized to the vulcanization of rubber.

> \* \* \*

> It is clear from this testimony that the locust bean gum was materially affected by these substances

> \* \* \*.

In view of the foregoing, I have great difficulty in understanding how it can be said that claims 24, 25, 30 and 32–36 are claiming the *same* invention as the interference counts. Claims cannot be read in a vacuum; and when those claims are read in light of appellant's specification, it is apparent that the word "compris-ing" contemplates the addition to the composition of at least two specific components, glyoxal and paper pulp, the very materials which the district court held "materially affected" the resultant composition.

While, in the traditional sense, those claims can properly be said to be "broader" than the interference counts, in a very real sense they are much narrower, for the specification makes it quite clear that the word "comprising" is in the claims for the sole purpose of permitting inclusion of glyoxal and paper pulp. Moreover, I cannot believe that the words "somewhat broader" and "slightly broader," as used in section 1101.02 B of MPEP, are meant to cover differences of the magnitude that exists between those claims and the interference counts.

In short, I feel that there was very probably a patentable distinction between the interference counts and claims 24, 25, 30 and 32–36. At any rate, it certainly was not *clear* that there was *not* such a distinction. I wish to point out that strict application of the so-called doctrine of "estoppel" tends to put a tremendous burden on an applicant who wishes to protect his priority rights to all subject matter to which he is lawfully entitled. First, he must be able to tell, once and for all, *precisely* what subject matter is *adequately supported* by the disclosures of *both* parties to the interference. Second, he must be able to tell whether any of that subject matter is *patentably distinct* from existing interference counts. And he *must* be correct, upon pain of losing any rights he might have to subject matter concerning which he is in error. This seems to me a very unrealistic set of requirements to impose upon an applicant who becomes involved in an interference, since the questions of patentable distinction and support are among the most difficult in patent law. I repeat again, it is only where the issue *clearly* could have been decided in the interference that an applicant should be precluded from having a determination of priority made in a subsequent ex parte case.

In considering the record, I have not found any indication that the board ever seriously considered the question of patentable distinction between claims 24, 25, 30 and 32–36 and the interference counts. The board merely said that since they "differ from each other only in scope, we fail to see wherein the broader claims before us are patentably distinct from the more narrow claims which formed the counts of the interferences."

No reasoning was set forth and no basis given for such a view. Since I am of the opinion that the board must find that the claims and the counts were *clearly not* patentably distinct, I would remand for a determination of that issue.

I am in full agreement with the majority's handling of the remaining claims and I therefore concur in that portion of the decision.